Filed 5/1/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>v.<br><br>RAUL VEGA VEGA,<br><br>   Defendant and Appellant. | A138179<br><br>(Sonoma County<br>Super. Ct. No. SCR595589) |

   A jury returned verdicts convicting defendant Raul Vega Vega of, among other things, one count of first degree murder (Pen. Code,[1] §§ 187, 189) and one count of voluntary manslaughter (§ 192, subd. (a)), together with two special circumstances findings and various gang and weapons-related sentence enhancements. The court imposed a prison term of life without possibility of parole.

   Defendant now appeals, assigning three forms of error. First, he claims CALCRIM No. 361, which advised the jury it could draw negative inferences if he failed to explain or deny the evidence against him, is unconstitutional and its use in this case was not supported by the evidence. Second, he claims his conviction of a substantive gang participation offense (§ 186.22, subd. (a)) in connection with the manslaughter must be reversed because he acted alone in committing that crime. Third, he claims the abstract of judgment must be corrected to accurately reflect the sentences imposed.

---

   [1] Statutory references, unless otherwise indicated, are to the Penal Code.

1

We hold there is no constitutional infirmity in CALCRIM No. 361 and we find adequate support in the record for its use in this case. We further hold, however, that the conviction on the substantive gang offense related to the manslaughter (count five) must be reversed based on developments in the applicable law after trial. Accordingly, we reverse the conviction on count five, order the abstract of judgment corrected, and otherwise affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The prosecution's case

The crimes at issue here arose out of a rivalry within the Sureños, a street gang controlled by the Mexican Mafia. An expert for the prosecution testified that, by 2009, two rival factions of the Sureños had emerged in Santa Rosa, known as Varrio Sureño Loco (VSL) and Angelino Heights (AH). There was an ongoing turf battle between these two groups over which of them controlled Southwest Community Park in Santa Rosa.

The expert identified defendant as a member of the Sureños. Gang members frequently display gang related tattoos, which they must "earn" by doing something to benefit the gang, such as committing crimes or supplying weapons. Defendant had "AH" and "Angelino" tattoos, indicating he was a member of the AH Sureños faction. The police believed defendant's gang moniker was "Crime Time."

#### 1. *The shooting of Dewey Tucker*

On January 12, 2010, the police came into possession of a letter written by an imprisoned VSL member calling for the assassination of three senior members of AH ―Hector Barragan (Barragan), his brother Max Barragan, and Miguel Rubio. The letter suggested that if VSL could get rid of these three "old homies," AH would be destroyed. The letter also said Barragan's close friend, Christopher Mancinas, should be killed. Mancinas was an influential Sureño who had spent time in prison and had direct ties to the Mexican Mafia.

The detective who obtained the letter shared its contents in a general way with Barragan on the same date he received it. The letter was not news to Barragan; prior rumors of death threats coming from VSL were known to AH. Barragan and Mancinas

2

called a meeting of AH members at Barragan's house in Santa Rosa to talk about these threats. Mancinas did most of the talking.

Mancinas and Barragan asked defendant—who was 18 years old at the time—to represent AH in connection with the threats. Defendant agreed. Gang experts testified that gangs often select young members to carry out violent crimes, both to give them a chance to "earn their stripes" and to minimize their exposure to punishment (because any sentences imposed on them will likely be lower than their more hardened gang associates would receive).

Mancinas asked defendant to name the person he trusted most to help with the operation, and he chose Javier Carreon-Lopez, a lifelong friend whom defendant loved like a brother. On January 12, 2010, defendant, Carreon-Lopez, Barragan and Mancinas drove to Petaluma, where they retrieved at least three guns ("straps"). They were in a Chevy Tahoe SUV that Mancinas had borrowed from his sometime girlfriend, who lived in Rohnert Park.

The four of them then headed to Vallejo, where a member of VSL named Ramon Ochoa lived. They were planning to target either Ochoa or another VSL member, Vincente Tapia, but Ochoa was the "main target." For defendant, killing Ochoa would avenge the death of Alejandro Ortega, a member of AH and a friend of defendant's, who had been killed by VSL in November 2009.

In Vallejo, the four met up with two other AH members called "Smokes" and "Huero," who lived in Vallejo and had been staking out Ochoa and Tapia on Mancinas's instruction. Smokes and Huero had reported back that they knew where one of the VSL members lived. Mancinas gave defendant a loaded gun, a black or grayish semiautomatic handgun, either a .40 or .45 caliber.

When the two AH groups converged in Vallejo they switched cars. From that point, defendant and Carreon-Lopez were in a Honda that Smokes or Huero had stolen in Vallejo earlier that day. They drove to Tapia's apartment building in two cars, with Carreon-Lopez driving the Honda and defendant in the passenger seat. Barragan and Mancinas were in the Tahoe along with Smokes and Huero.

3

Both cars stopped outside Tapia's apartment complex, where Mancinas pointed out a white car coming out of the driveway. He phoned defendant and said Ochoa was in that car and they should follow it. They followed the white car as it left Vallejo and headed south on Interstate 80. Defendant admitted to police that once he caught up to the white car on the freeway, he fired at least two shots at the driver, believing it was Ochoa.

Defendant told police he knew the gunfire struck its intended target because the driver slumped over in the car. The white car, which had just crossed the Carquinez Bridge, collided with the center divider, then swerved to the shoulder of the highway. Defendant and Carreon-Lopez then returned to Santa Rosa, dumping the Honda along the way. Defendant's brother sent "some girl" to pick them up. Afterwards, they met up with Barragan in a park in Santa Rosa.

Tragically, it turned out, defendant's shots found the wrong target. What had been planned as a preemptive revenge killing against a gang rival was a case of mistaken identity. The gunshot victim was Dewey Tucker, who had the misfortune of living in the apartment just above Tapia's. Tucker was a professional musician who was on his way to practice with his band in Oakland. A bullet entered Tucker's left ear and exited his right ear, killing him at the scene.

### 2. *The stabbing of Juan Carlos Angel-Esparza*

About a year after Tucker's murder, on January 8, 2011, Juan Carlos Angel-Esparza was stabbed to death on the grounds of Kawana Springs Elementary School (Kawana Springs) in Santa Rosa, which is two or three miles from Southwest Community Park. Late that afternoon, Angel-Esparza had been hanging out at Kawana Springs, smoking marijuana and talking about football with his friends Ezequiel Corona and Edgar Sonato-Vega.[2]

Corona and Sonato-Vega, who had no gang affiliation, testified that two men entered the school grounds from the rear of the school. Angel-Esparza approached them,

---

[2] Sonato-Vega is not related to defendant, but both Sonato-Vega and Corona knew Vega, since they all lived on the same street when they were younger.

4

while Sonato-Vega and Corona hung back, continuing to smoke marijuana. One or both of the men asked Angel-Esparza where he was from. In gang culture, asking that question of a suspected gang rival is commonly understood as a verbal provocation, a challenge to fight. In response, Angel-Esparza said, "VSL."

A fight then broke out between Angel-Esparza and one of the two newcomers. Sonato-Vega told police that defendant was the person with whom Angel-Esparza was fighting, but at trial he claimed not to know who the other combatant was. At trial Corona also claimed no knowledge of the other combatant. The evidence at trial was similarly mixed as to who issued the original provocation—Angel-Esparza; both defendant and his companion; or just defendant.

Sonato-Vega testified to seeing Angel-Esparza pull a knife as the fight was breaking up, but he did not see a knife in defendant's hands. Corona testified that he did not see anyone with a knife until after Angel-Esparza and defendant separated, and it appeared Angel-Esparza was hurt. That is when Angel-Esparza pulled out a Dallas Cowboys pocket knife and moved toward defendant with it, as defendant backed away. Toward the end of the fight sirens started blaring. Angel-Esparza and defendant backed away from one another and ran off in opposite directions.

Angel-Esparza ran to the front of the school and collapsed in a breezeway, while defendant and his companion left the area through the rear. Sonato-Vega and Corona went to Angel-Esparza's side, and he told them to call an ambulance, so they called 911. Sonato-Vega took Angel-Esparza's Cowboys knife and threw it on the roof of the school, where it was later recovered by the police. Angel-Esparza was taken by ambulance to the hospital, where he died shortly thereafter from three stab wounds, including one directly to the heart and one to the liver.

Before the police arrived, Corona and Sonato-Vega made a plan to say they had not witnessed the fight and had just found Angel-Esparza lying on the school grounds. During questioning later that night, however, Corona eventually admitted to the police that he had heard gang challenges to Angel-Esparza before the fight, had heard Angel-Esparza claim "VSL," and had seen the fight.

5

At one point, while they were at the police station, Corona and Sonato-Vega were placed in a room alone together, where they were video recorded. Sonato-Vega asked Corona, "Did you tell them it was Raul?" This was the break in the case that first alerted police to defendant's involvement, as one of the officers was familiar with defendant and his gang affiliation.

Police investigating the stabbing found two knives in the vicinity—one was a pocket knife with a locking blade and a Dallas Cowboys logo on it, which belonged to Angel-Esparza and was found on the roof of the school. It was covered in blood, which proved to be Angel-Esparza's. Angel-Esparza's thumbprint was also found on the knife, but defendant's prints were not. A second knife located at the scene was a blade without a handle, which had no blood on it.[3] There was a small amount of blood on the pathway near where the fight had occurred, and it proved to be defendant's.

### 3. Defendant's incriminating statements to police

When defendant was questioned by the police two days after Angel-Esparza's death, he initially denied involvement, but eventually admitted fighting with Angel-Esparza. He claimed the killing was in self-defense because Angel-Esparza pulled a knife. Defendant said he took the knife from Angel-Esparza, but Angel-Esparza had another one. Angel-Esparza said he was a member of VSL, and defendant believed Angel-Esparza attacked him because of defendant's AH affiliation.

Defendant claimed that when Angel-Esparza attacked him, he suffered a cut to the face and thought he was going to be killed, but he managed to wrestle the knife away from Angel-Esparza and push it towards him, evidently sticking him with it. Defendant admitted a friend was with him at Kawana Springs that day, but he did not give the police the friend's name. He did not implicate his friend in the fight and told them his friend "is not a banger."

---

[3] The prosecutor theorized at trial that neither of the knives found at the scene was the one that killed Angel-Esparza. He suggested to the jury that defendant had brought his own knife to the school grounds and may have been the first to draw a weapon.

6

After Vega finished his interview with the Santa Rosa police, representatives of the Sonoma County Sheriff's Office and the California Highway Patrol interviewed him about the Tucker murder. It was during this interview that defendant made statements placing himself at the scene of the shooting and admitting to having been the triggerman. Among other things, he also described himself as a "killer", and claimed to have "stabbed a lot of people" before. He showed police a tattoo of a left-handed gunman.[4] He said he had earned it by killing Tucker.

In addition, defendant made a number of damaging admissions concerning his cell phone. On the date of Tucker's murder, 12 calls were made between Vega's phone and a cell phone used by Mancinas. The phone the police associated with defendant had been purchased in the name "Crime Time." Vega confirmed during his police interview that the phone was his. He further admitted he and Mancinas were phoning back and forth to each other during the events surrounding the killing.

Cell phone evidence at trial showed that Mancinas's cell phone was in Petaluma, where he lived, until 6:23 p.m. on January 12, 2010. At 6:24 p.m. Mancinas's phone traveled north on Highway 101 and was in Rohnert Park, where Mancinas's girlfriend lived, at 6:36 p.m. At 7:53 p.m. his phone was on the south end of Santa Rosa, and at 8:43 p.m. it was in Vallejo.

At 9:18 and 9:36 p.m. the phone was traveling further east in Vallejo, toward Tapia's apartment complex. Two calls were made in the vicinity of the apartments. At 9:49 the phone was moving south along Interstate 80, and at 9:51 it crossed the Carquinez Bridge. Near the place where Tucker's car had come to rest, Mancinas's phone crossed paths with defendant's phone. At 9:54 p.m., the phone was headed in the opposite direction, back over the Carquinez Bridge, through Vallejo and back to Petaluma by 10:45 p.m. At 10:59 p.m. his phone was back in Rohnert Park. Mancinas's girlfriend confirmed that Mancinas had borrowed her Tahoe that night, as he sometimes did for gang "business," and he returned it about 10:00 or 11:00 p.m.

---

[4] Vega is left-handed.

In May 2010, police searched an apartment occupied by suspected members of the Sureños and found a .40-caliber handgun. Two shell casings recovered at the scene of Tucker's killing were determined to have been fired from that handgun. An expert testified that gangs often have "gang guns" which they pass from one member to another and use for self-defense or to commit crimes for the gang.

## B. Defendant's trial testimony

At trial, defendant's version of the events surrounding the stabbing of Angel-Esparza closely tracked the version he gave the police. Things began when he and a friend, Giovanni, went to Kawana Springs to hang out. As he and Giovanni entered the school from the rear, they saw three or four other people on the school grounds. Defendant recognized Corona and Sonato-Vega, each of whom he had known from growing up in the same neighborhood.

Defendant testified that he and Giovanni had gone to Kawana Springs to unwind after he got off work. They had not seen each other in three to six months and were looking forward to catching up. He did not tell the police Giovanni's name because he did not want to get him in trouble or get him deported. After he and Giovanni arrived at Kawana Springs, Angel-Esparza approached him and asked where he was from, whether he was a "northerner," and whether he was "AH." Angel-Esparza said he was "VSL."

Although he knew Kawana Springs was a place frequented by gang members where fights often occurred, defendant denied having a knife when he went to Kawana Springs. After Angel-Esparza approached him and provoked the confrontation, he and Angel-Esparza began fighting, at first only with fists. Defendant did not remember who threw the first punch. At first defendant did not see any weapons in Angel-Esparza's hands. Angel-Esparza kicked defendant in the groin and he fell to his knees. At that point he saw a knife in Angel-Esparza's hand and tried to block it, but Angel-Esparza cut defendant's lip with it.

Fearing he would be stabbed in the face or head, defendant wrestled the knife away from Angel-Esparza, pushed it toward Angel-Esparza, and the knife blade broke. Angel-Esparza then pulled out a second knife, a pocket knife. Defendant testified he

8

backed away, but Angel-Esparza kept coming at him with the second knife. Although defendant claimed he did not know that Angel-Esparza had been stabbed, he saw Angel-Esparza grab his chest, bend over, and run toward the front of the school. He and Giovanni ran the other way.

Defendant's handling of the Tucker murder in his trial testimony, by contrast, diverged sharply from what he told the police. Defendant testified he did not kill Tucker and knew nothing about the killing. He said he had never owned a gun and had not owned a cell phone until long after the Tucker murder. He denied going by the name "Crime Time," claiming his nicknames were "Chonga" and "Crime."

Defendant denied being in Vallejo in January 2010. He testified he did not personally know Barragan or Mancinas, although he had heard of them. He claimed that whatever details he provided to the police during his interview about the Tucker killing reflected simply what he had learned from them during the interview. Defendant said his statement to the police had been aimed at telling them "what they wanted to hear" and whatever "sounded good."

On cross-examination defendant admitted he initially lied to the police in claiming he knew nothing about the death of Angel-Esparza. He admitted his tattoos were "gang tattoos," that he was a member of AH, that he had been involved with gangs since he was 12 or 13 years old, and that he was proud to be a member of AH.

### C. Procedural history

Defendant was charged with two counts of murder (§ 187), one count of discharging a firearm at an inhabited vehicle (§ 246) in connection with Tucker's death, and two counts of active participation in a criminal street gang on the dates of the two murders (§ 186.22, subd. (a)). With respect to the Tucker murder and the section 246 offense, the fourth amended information also alleged enhancements based on firearm use, discharge, and discharge causing great bodily injury or death (§ 12022.53, subds. (b), (c), (d) & (e)(1)), along with gang enhancements (§ 186.22, subd. (b)(1)(C) & (b)(4) ), and with respect to the murder, two special circumstance allegations: gang-related murder (§ 190.2, subd. (a)(22)) and murder by discharge of a firearm from a motor vehicle

9

(§ 190.2, subd. (a)(21)).  On the Angel-Esparza killing, the charges included a gang enhancement (§ 186.22, subd. (b)(1)(C)) and an enhancement for personal use of a deadly weapon (knife) (§ 12022, subd. (b)(1)).

The case went to the jury on October 15, 2012.  In addition to instruction on the charged offenses, the jury was instructed on perfect and imperfect self-defense and heat of passion voluntary manslaughter.  The jury deliberated more than 30 hours over eight days before reaching its verdicts.  It convicted defendant of first degree murder of Tucker (count one) and voluntary manslaughter for the death of Angel-Esparza (count three).  It also convicted him of shooting at an occupied vehicle (count two) and two counts of gang participation (counts four and five).  It further found true all of the alleged enhancements and special circumstances, except it deadlocked on the gang enhancement on the killing of Angel-Esparza.

On March 11, 2013, in light of the special circumstance findings, the court sentenced defendant to life in prison without possibility of parole for the murder of Tucker (count one) (§§ 187, 190.2, subd. (a)), with a 25-to-life consecutive term for firearm discharge causing great bodily injury or death (§ 12022.53, subd. (d)), plus a sentence of life with the possibility of parole for shooting at an occupied vehicle, with all punishment on count two stayed under section 654.  The court stayed the remaining gang and firearm enhancements.  It further sentenced defendant to 12 years for the voluntary manslaughter of Angel-Esparza (count three) (including the related weapon enhancement).  (§§ 192, subd. (a), 12022, subd. (b)(1).)  It sentenced defendant to three years (concurrent) on each of the substantive gang participation offenses (counts four and five) (§ 186.22, subd.(a)) and stayed those terms under section 654.

This timely appeal followed.

## II. DISCUSSION

### A.  CALCRIM No. 361 is not unconstitutional and was properly given in this case.

Defendant's first claim on appeal is that the court erred in giving the jury CALCRIM No. 361, which told them: "If the defendant failed in his testimony to explain

10

or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt. [¶] If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

Defense counsel did not object to the instruction, and in fact, agreed it should be given if defendant testified. The Attorney General therefore contends any claim of instructional error was forfeited. Generally, failure to object does not waive an instructional error on appeal if the instruction was an incorrect statement of law or the defendant's substantial rights were affected. (§ 1259; *People v. Fiore* (2014) 227 Cal.App.4th 1362, 1377–1378.) The invited error doctrine likewise poses no obstacle to raising a claim of instructional error on appeal, unless there was a conscious, deliberate or tactical reason stated for the appellant's acquiescence in the instruction at trial. (*People v. Hernandez* (1988) 47 Cal.3d 315, 353; *People v. Collins* (1992) 10 Cal.App.4th 690, 694–695.)

We ultimately conclude the claimed error could not have been prejudicial on counts one and two due to the strength of the evidence, and was not prejudicial as to count three due to the conviction of a lesser offense on that charge. Nevertheless, we address the merits of defendant's attack on CALCRIM No. 361 because he claims it incorrectly states the law, and in order to forestall a future claim of ineffective assistance of counsel. (*People v. Fiore, supra,* 227 Cal.App.4th at pp 1377–1378 & fn. 10.) We employ de novo review for a claim of instructional error of this nature. (*People v. Posey* (2004) 32 Cal.4th 193, 218; *People v. Rodriguez* (2009) 170 Cal.App.4th 1062, 1066.)

### 1. *Constitutionality*

In addressing the constitutionality of CALCRIM No. 361, we do not write on a clean slate. In *People v. Saddler* (1979) 24 Cal.3d 671, 675, 678–681 (*Saddler*), our Supreme Court upheld the constitutionality of CALJIC No. 2.62, a pattern instruction

11

similar in substance to CALCRIM No. 361.[5]  More recently, in *People v. Rodriguez*, *supra*, 170 Cal.App.4th at pp. 1067-1068 (*Rodriguez*), Division Four of the Second District Court of Appeal rejected a constitutional challenge to CALCRIM No. 361. Defendant advances arguments similar to those made and rejected in *Saddler* and virtually identical to those made and rejected in *Rodriguez*.  He asks us to depart from the path taken in those cases, but we decline to do so.

CALCRIM No. 361 rests on the logical inference that if a person charged with a crime is given the opportunity to explain or deny evidence against him but fails to do so (or gives an implausible explanation), then that evidence may be entitled to added weight.  The defendant in *Saddler* argued that CALJIC No. 2.62 compromised his privilege against self-incrimination.  (*Saddler, supra,* 24 Cal.3d at p. 678.)  In this case, defendant claims it violated his right to testify, citing *People v. Gutierrez* (2009) 45 Cal.4th 789, 821, and his right to a fair trial, citing *Duncan v. Louisiana* (1968) 391 U.S. 145, 148–149 [right to jury trial].  Using these bedrock procedural protections as a foundation, defendant builds an argument that it was fundamentally unfair to tell jurors they could draw reasonable factual inferences against him based on unsatisfactory and implausible answers to questions during his testimony.

We see no inconsistency between defendant's right to testify and the attendant risk of being confronted with evidence calling into question his testimony.  The failure to

---

[5] CALJIC No. 2.62 reads as follows:  "In this case defendant has testified to certain matters.  [¶]  "If you find that [a] [the] defendant failed to explain or deny any evidence against [him] [her] introduced by the prosecution which [he] [she] can reasonably be expected to deny or explain because of facts within [his] [her] knowledge, you may take that failure into consideration as tending to indicate the truth of this evidence and as indicating that among the inferences that may reasonably be drawn therefrom those unfavorable to the defendant are the more probable.  [¶]  The failure of a defendant to deny or explain evidence against [him] [her] does not, by itself, warrant an inference of guilt, nor does it relieve the prosecution of its burden of proving every essential element of the crime and the guilt of the defendant beyond a reasonable doubt. [¶] If a defendant does not have the knowledge that [he] [she] would need to deny or to explain evidence against [him,] [her,] it would be unreasonable to draw an inference unfavorable to [him] [her] because of [his] [her] failure to deny or explain this evidence."

explain or deny adverse evidence can be a basis for disbelieving any witness's testimony and is always relevant to credibility. (See CALCRIM No. 226 [factors jury may consider in evaluating witnesses' testimony include: "Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony? [¶] How reasonable is the testimony when you consider all the other evidence in the case? [¶] [Did other evidence prove or disprove any fact about which the witness testified?]"].) In that sense, CALCRIM No. 361 represents nothing more than a specific application of a general rule applicable to all witnesses.

*Saddler* referred to CALJIC No. 2.62 as "the comment rule," which, prior to the Supreme Court's decision in *Griffin v. California* (1965) 380 U.S. 609 (*Griffin*), historically allowed the trial judge to comment on a defendant's failure to explain or deny incriminating evidence. (*Saddler, supra,* 24 Cal.3d at p. 680.) For many years, the "comment rule" was codified in former Article I, section 13 of the California Constitution. (*Id.* at p. 678 & fn. 5.) *Griffin* found a Fifth Amendment violation where, pursuant to Article I, section 13 as it then stood, a jury was instructed it may consider, and the prosecutor commented upon, the defendant's failure to testify.[6] (*Griffin*, *supra*, 380 U.S. at pp. 612-615.)

Former Article I, section 13 was repealed in 1974 and its text restated in Article I, section 15, with no reference to the comment rule. However, the rule survives today in section 1127, which provides in part that the trial court, in instructing the jury, "may make such comment on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the case and in any criminal case, whether the defendant testifies or not, his failure to explain or to deny by his

---

[6] The instruction given by the court in *Griffin* was as follows: "As to any evidence or facts against him which the defendant can reasonably be expected to deny or explain because of facts within his knowledge, if he does not testify or if, though he does testify, he fails to deny or explain such evidence, the jury may take that failure into consideration as tending to indicate the truth of such evidence and as indicating that among the inferences that may be reasonably drawn therefrom those unfavorable to the defendant are the more probable." (*Griffin*, *supra*, 380 U.S. at p. 610.)

13

testimony any evidence or facts in the case against him may be commented upon by the court." (See also Evid. Code, § 413 [trier of fact may consider any "party's failure to explain or to deny by his testimony such evidence or facts in the case against him"].) To the extent the language of section 1127 can be read to allow judicial comment when a defendant declines to testify, its validity is not before us. But when a defendant does testify, all bets are off. He waives his Fifth Amendment privilege (*Saddler*, *supra*, 24 Cal.3d at p. 679) and is subject to cross-examination just as any other witness is. (*People v. Wagner* (1975) 13 Cal.3d 612, 618; *People v. Zerillo* (1950) 36 Cal.2d 222, 227-229.)

Defendant relies in part on a case critical of CALJIC No. 2.62, *People v. Haynes* (1983) 148 Cal.App.3d 1117, 1119-1120 (*Haynes*), in which the court suggested it would be "unwise" to give CALJIC No. 2.62 without inquiring as to the position of the parties (which the trial court did here), and said it should only be used if the defendant's testimony included significant omissions or failure to explain or deny. (*Id.* at pp. 1119-1120.) As we will discuss further, the *Haynes* prerequisites existed in this case.

The criticism expressed in *Haynes*—and its proposed limitations on the instruction's use—have been taken to heart in subsequent cases. CALCRIM No. 361 is not to be given every time a defendant testifies. Rather, the courts long ago imposed limits on the circumstances under which CALJIC No. 2.62 may be given, and the Bench Notes to CALCRIM No. 361 indicate the same restrictions apply in using CALCRIM No. 361. (CALCRIM No. 361 (2015) Bench Notes, pp. 168-169.) "If a defendant has not been asked an appropriate question calling for either an explanation or denial, the instruction cannot be given, as a matter of law." (*People v. Roehler* (1985) 167 Cal.App.3d 353, 392 [CALJIC No. 2.62]; accord, *People v. Mask* (1986) 188 Cal.App.3d 450, 455 [CALJIC No. 2.62].)

When a defendant testifies, however, and "fails to deny or explain inculpatory evidence or gives a 'bizarre or implausible' explanation, the instruction is proper." (*People v. Sanchez* (1994) 24 Cal.App.4th 1012, 1029–1031 [CALJIC No. 2.62]; accord, *People v. Mask*, *supra*, 188 Cal.App.3d at p. 455 [CALJIC No. 2.62 is warranted "if the defendant tenders an explanation which, while superficially accounting for his activities,

14

nevertheless seems bizarre or implausible"]; *People v. Belmontes* (1988) 45 Cal.3d 744, 784, overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Roehler*, *supra*, 167 Cal.App.3d at p. 393.)

In an effort to persuade us that this case should not be governed by the legal framework established in *Saddler* and *Rodriguez*, defendant adds the twist that the existence of CALCRIM No. 361 and its possible use at trial could have a "chilling effect" on defendants generally and dissuade them from testifying. The idea that a "chilling effect" on others not before the court should be taken into account in constitutional adjudication is familiar from First Amendment overbreadth and vagueness doctrines (see, e.g., *People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1114; *Concerned Dog Owners of California v. City of Los Angeles* (2011) 194 Cal.App.4th 1219, 1230-1232), a setting where questions often arise about whether those whose voices are potentially stifled by overbroad or vague regulation of free expression will be motivated to bring constitutional challenges. But that mode of analysis seems a poor fit here.

Even assuming an undue "chilling effect" on the procedural rights of criminal defendants generally may properly be raised as a basis for challenging a jury instruction (see *People v. Beyah* (2009) 170 Cal.App.4th 1241, 1248–1250), we think it unlikely that CALCRIM No. 361 would have that effect beyond the ever-present prospect of facing cross examination. It certainly did not have that effect here. The jury instructions in this case were settled before defendant took the stand. Thus, defendant testified at length despite the knowledge in advance that he would face this instruction, and his counsel acquiesced.

Defendant further contends the giving of CALCRIM No. 361 violated his due process rights by depriving him of a fundamentally fair trial. (U.S. Const., amends. V, XIV.) In this thread of his argument, defendant characterizes CALCRIM No. 361 as a pinpoint instruction that singled him out for treatment different from that of other witnesses. (See *People v. Harris* (1989) 47 Cal.3d 1047, 1099 [improper for court to "single out a particular witness in an instruction"].) The unfair "singling out" complaint

15

advanced by defendant was rejected in *Saddler*, *supra*, 24 Cal.3d at pages 680-681, and *Rodriguez*, *supra*, 170 Cal.App.4th at page 1067, and we likewise reject it here.

The response to that argument can be traced to *Caminetti v. United States* (1917) 242 U.S. 470, 493 (*Caminetti*), where the United States Supreme Court said that an accused who takes the stand "subjects himself to the same rule as that applying to any other witness." The court explained that "where the accused takes the stand in his own behalf and voluntarily testifies for himself . . . he may not stop short in his testimony by omitting and failing to explain incriminating circumstances and events already in evidence, in which he participated and concerning which he is fully informed, without subjecting his silence to the inferences to be naturally drawn from it." (*Id*. at p. 494.)

As our Supreme Court noted more recently in *Saddler*—specifically addressing the identical issue raised here—"Defendant . . . argues that the challenged instruction should never be given because it impermissibly singles out a defendant's testimony and unduly focuses upon it. The same argument was rejected in *People v. Mayberry* [(1975)] 15 Cal.3d 143, 161. We noted there that the instruction was consistent with Evidence Code 413, which permits the drawing of inferences from any party's failure to explain or deny evidence against him. Since the only testifying 'party' in a criminal case is the defendant, the code section can have reference only to him." (*Saddler*, *supra*, 24 Cal.3d at pp. 680-681.)

To avoid the "singling out" problem, defendant suggests that CALCRIM No. 226, which specifies certain matters the jury may consider in determining the credibility of witnesses, should be amended to reflect the same substance currently conveyed in CALCRIM No. 361, and CALCRIM No. 361 itself should be jettisoned. In addition, he criticizes *Saddler*, *supra*, 24 Cal.3d at pages 680-681 and *Rodriguez*, *supra*, 170 Cal.App.4th at pages 1067-1068, because those cases rest in part on Evidence Code section 413, which allows the fact finder to draw adverse inferences from the failure of a party to explain or deny evidence against the party. Defendant argues that however useful Evidence Code section 413 may be in civil cases, it has no place in criminal trials.

16

These arguments are more appropriately pitched to the Legislature and the Judicial Council. We decline the invitation to engage in wholesale revision of the CALCRIM instructions and selective disabling of the Evidence Code in criminal cases just to avoid a hypothetical "chilling effect" on other defendants. CALCRIM No. 361, we hold, is not unconstitutional.

### 2. There was an evidentiary foundation for giving CALCRIM No. 361.

Although *Saddler* held there was no constitutional or other infirmity in CALJIC No. 2.62, it also held the instruction was improperly given at Saddler's trial because there was no failure by Saddler—who presented an alibi defense—to explain or deny the other evidence at trial. (*Saddler*, *supra*, 24 Cal.3d at pp. 681-683.)

The same cannot be said here. Defendant confessed to murdering Tucker when questioned by the police but then claimed at trial he was entirely innocent. This was obviously something he needed to explain to the jury, and he tried. He said he already was in custody for the separate killing of Angel-Esparza and had left blood at Kawana Springs, where he and Angel-Esparza had fought. He claimed he knew he "wasn't going anywhere" but to jail, and the detectives wanted him to be a "badass." Under these circumstances, defendant claimed, he thought he might as well confess to Tucker's murder. It was not a "very serious matter," he said. This dismissive attempt to explain his earlier confession was implausible and, in and of itself, warranted the giving of CALCRIM No. 361.

More specifically, defendant acknowledged to the police that the cell phone registered to Crime Time was his "old number" when he was interviewed in January 2011. Yet at trial he claimed he neither owned a cell phone in January 2010 nor went by the name "Crime Time", an implausible denial in light of his own prior admission. And, of course, defendant failed to explain why he had 12 phone calls in one day with Mancinas, someone he had heard of (according to his trial testimony) but did not personally know.

17

During his police interview, defendant also implicated in the Tucker murder high-ranking AH gang members, as well as Carreon-Lopez, whom he loved like a brother. Though he tried to explain why he incriminated himself, he never explained why he was willing to implicate senior members of AH or his best friend, given that "snitching" on the leadership of his own gang or being a "rat" could have led to retaliation by the gang.

Because defendant's explanations for the evidence against him were implausible, the record supports the giving of CALCRIM No. 361. (*People v. Sanchez*, *supra*, 24 Cal.App.4th at p. 1030.) On this record, the inference that defendant was lying about the Tucker murder on the stand was practically inescapable, making it fully appropriate to advise the jury that they may—not must—give his earlier confession heightened credibility under CALCRIM No. 361.

### 3. *Harmless error analysis*

Defendant contends CALCRIM No. 361 was not only improperly given to the jury, but was prejudicial as to counts one and two. He does not seem to argue it was prejudicial as to count three. Nor could he support such an argument, given that he was acquitted of murder and succeeded in obtaining a voluntary manslaughter conviction for the killing of Angel-Esparza.

The parties disagree about the appropriate standard of prejudice. Defendant insists that a *Chapman* standard is called for (see *Chapman v. California* (1967) 386 U.S. 18, 24) , while the Attorney General points out that *Saddler* and other cases have employed the *Watson* standard, (see *People v. Watson* (1956) 46 Cal. 2d 818, 836). (See also *Saddler*, *supra*, 24 Cal.3d at p. 683; *People v. Roehler*, *supra*, 167 Cal.App.3d at p. 393 [courts have "rather uniformly" applied *Watson*].) Under either standard, even assuming there was error, it was harmless on counts one and two due to the overwhelming evidence against defendant, most notably his own confession.

What occurred here bears none of the indicia of a "false confession" case.[7]  There was plenty of detail in the narrative defendant gave police to corroborate its reliability.  Defendant knew more about the offense than the police had told him, and many of those details were confirmed by other evidence.  For instance, he knew that Mancinas had borrowed a Chevy Tahoe from "some girl" on the night in question, which Mancinas's girlfriend confirmed.  He knew the Honda used in the shooting had been stolen in Vallejo, which the owner confirmed.  He knew the approximate caliber of the weapon used, which ballistics confirmed.

There was also evidence independent of the confession linking defendant to the crime scene.  The route defendant described traveling with his crime partners matched the route traveled by Mancinas's cell phone, as shown by cell phone records.  He and Mancinas were in separate cars, and the cell phone "map" showing their movements at the time of the shooting had the two of them converging precisely at the location of the shooting.  Then there was the number of calls he made and who he spoke to by phone in the time just before and after the murder.  Defendant failed to explain why he and Mancinas—a man defendant claimed he had heard of but did not personally know—traded 12 phone calls on the night of Tucker's murder.

The investigative technique most often recommended as a best-practices safeguard against false confessions—recording of custodial interrogations[8]—was followed in this

---

[7] See Leo and Ofshe, *Criminal Law: The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation* (1998) 88 J. Crim. L. & Criminology 429, 436 [frequently cited study of 60 false confession cases, all of which "satisf[ied] the following conditions: no physical or other significant and credible evidence indicated the suspect's guilt; the state's evidence consisted of little or nothing more than the suspect's statement 'I did it;' and the suspect's factual innocence was supported by a variable amount of evidence—often substantial and compelling—including exculpatory evidence from the suspect's post-admission narrative. For every case included . . . there was no credible evidence corroborating the defendant's 'I did it' admission or supporting the conclusion that he was guilty." (Fns. omitted.)]

[8] See California Commission on the Fair Administration of Justice, Report and Recommendations Regarding False Confessions (July 25, 2006) at <http://www.ccfaj.org/rr-false-official.html> [as of April 29, 2015].

19

case, and the recording of defendant's confession, on video, was provided to the jury. If there was some kind of coercion or psychological dynamic explaining why defendant might falsely implicate himself in Tucker's murder, it was there in the record for him to argue. But he never did, and he makes no real effort to do so now. Defendant essentially suggests that once he realized he was likely going to prison for the killing of Angel-Esparza, his confession to the Tucker murder (and several other acts of violence) was driven by machismo. The problem with this portrayal of why he confessed is that it does not necessarily mean the confession was false. Defendant may well have incriminated himself out of machismo, but the jury clearly believed it was also true he shot Tucker.

The jury having watched defendant's video-taped confession, little could have been said (or left unsaid) to dilute its impact on them. To be sure, even with firsthand evidence of defendant's violent proclivities put graphically before them, the jury did not simply label him a violent man and a liar and convict him of all charges. Instead, it deliberated for more than 30 hours to arrive at a split verdict, which suggests it believed his testimony about the death of Angel-Esparza up to a point. His complete denial of knowledge of the Tucker murder, however, appears to have been a bridge too far. He admittedly knew too much about the crime to have any credibility in denying all involvement.

Finally, we evaluate the impact of CALCRIM No. 361 in the context of the instructions as a whole, starting with the carefully constructed internal balance to No. 361 itself. CALCRIM No. 361 does not direct the jury to draw an adverse inference. It instructs the jury that failure to explain or deny *alone* is not a sufficient basis upon which to infer guilt, and it highlights the prosecution's burden to prove guilt beyond a reasonable doubt. (*People v. Lamer* (2003) 110 Cal.App.4th 1463, 1472-1473; *People v. Ballard* (1991) 1 Cal.App.4th 752, 756-757.) Ultimately, the instruction leaves the "meaning and importance" of the failure to explain or deny in the jurors' hands. (CALCRIM No. 361.) It is also notable that the trial court told the jury here that not all the instructions were necessarily applicable (CALCRIM No. 200), and advised jurors to follow the instructions that applied to the facts determined by them, thereby "mitigat[ing]

20

any prejudicial effect" related to the giving of CALCRIM No. 361, if it were deemed to be improper.  (*People v. Lamer*, *supra*, at p. 1472, see also *Saddler*, *supra*, 24 Cal.3d at p. 684.)

Even assuming error in the giving of CALCRIM No. 361, the error was harmless on this record.  Given the strength of the evidence against defendant on counts one, two and three, we cannot imagine this jury would have entertained any reasonable doubt about his guilt on any of those counts even if CALCRIM No. 361 had not been given.

**B.**     **The conviction of a gang participation offense related to the killing of Angel-Esparza must be reversed under *People v. Rodriguez* (2012) 55 Cal.4th 1125.**

Defendant contends his conviction for the substantive gang participation offense in violation of section 186.22, subdivision (a), related to the killing of Angel-Esparza must be reversed because the evidence established that he acted alone, not in concert with other gang members.[9]  Defendant's argument rests on *People v. Rodriguez* (2012) 55 Cal.4th 1125, which held that a substantive gang offense under section 186.22, subdivision (a), requires the participation of at least two members of the same gang in felonious conduct.  He contends the evidence was insufficient under *People v. Rodriguez* because it did not establish that Giovanni (1) was an AH gang member or (2) participated in the fight.  We agree.

The Attorney General argues the evidence was sufficient because it showed that Giovanni participated with defendant in issuing gang challenges, and hence, "more than one gang member was involved in the fight."  The Attorney General seems to suggest that by making gang challenges, remaining present during the fight, and encouraging defendant to escalate the confrontation, Giovanni aided and abetted a felony assault.  (See

---

[9] Section 186.22, subdivision (a) provides:  "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished by imprisonment in a county jail for a period not to exceed one year, or by imprisonment in the state prison for 16 months, or two or three years."

*People v. Ayala* (2010) 181 Cal.App.4th 1440, 1451-1453.) Thus, she argues, "Giovanni's presence and support made it more likely that appellant would participate in the gang-challenge fight and made it easier for him to do so knowing that he had backup."

Though thin, we might find substantial evidence for the jury's conviction on count five had it been instructed on the necessity of finding felonious criminal participation by more than one gang member. Since the jury was not so instructed, however, we question whether the jury ever, in fact, made the required finding when we evaluate the record in light of recent developments in the applicable law that have occurred since the trial.

"The substantive offense defined in section 186.22(a) has three elements. Active participation in a criminal street gang, in the sense of participation that is more than nominal or passive, is the first element . . . . The second element is 'knowledge that [the gang's] members engage in or have engaged in a pattern of criminal gang activity,' and the third element is that the person 'willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang.' [Citation.]" (*People v. Lamas* (2007) 42 Cal.4th 516, 523.)

In *People v. Rodriguez*, *supra*, 55 Cal.4th 1125, 1131–1139, the California Supreme Court held the third element is not satisfied when a gang member commits a felony while acting alone. (*Id*. at pp. 1131-1139.) The word "members," it explained, "is a plural noun." (*Id*. at p. 1132.) "Therefore, to satisfy the third element, a defendant must willfully advance, encourage, contribute to, or help *members* of his gang commit felonious criminal conduct. The plain meaning of section 186.22 (a) requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member." (*Ibid*.) The Supreme Court interpreted the statute to require that one of the people who engaged in the felonious conduct (in addition to defendant) must have belonged to the same gang in which defendant is an active participant (AH). (*Id*. at p. 1131; accord, *People v. Velasco* (2015) 235 Cal.App.4th 66, 78.)

22

Thus, for the jury to have convicted defendant on count five, it would have had to find that he "willfully promote[d], further[ed], or assist[ed] in . . . felonious criminal conduct by" Giovanni. In addition, it would have had to find that Giovanni was a fellow AH gang member. Whether Giovanni's role in the confrontation with Angel-Esparza met either of these conditions was subject to serious doubt.

*People v. Rodriguez* was decided two months after the verdicts in this case were rendered. Regardless whether *People v. Rodriguez* announced a new restriction on criminal liability under section 186.22, subdivision (a), or merely clarified an existing rule, defendant's conviction was not final when *People v. Rodriguez* was decided and he is entitled to the benefit of that decision.[10] (*In re Borlik* (2011) 194 Cal.App.4th 30, 40-41 (*Borlik*).)

Significantly, following the decision in *People v. Rodriguez*, CALCRIM No. 1400, which defines the substantive crime under section 186.22, subdivision (a), was amended to add the following language: "At least two gang members of that same gang must have participated in committing the felony offense. The defendant may count as one of those members if you find that the defendant was a member of the gang."[11] Because the jury was instructed before *People v. Rodriguez* was decided, this language was not included in its instruction. We therefore cannot presume the jury found the necessary participation by two or more gang members. If, as we suspect, the jury never made that

---

[10] Insofar as *People v. Rodriguez* merely clarified an existing rule or resolved a conflict among the district courts of appeal, defendant was entitled to have *People v. Rodriguez* applied to his case. (*Borlik*, *supra*, 194 Cal.App.4th at pp. 40-41 [if no new rule announced "the decision simply becomes part of the body of case law of this state, and under ordinary principles of stare decisis applies in all cases not yet final"].) Here, *People v. Rodriguez* expressly declared it was "resolv[ing] a conflict in the Courts of Appeal." (*People v. Rodriguez*, *supra*, 55 Cal.4th at p. 1128.) But even if *People v. Rodriguez* is seen as establishing a new rule, if there was no prior rule upon which defendant reasonably relied, then the new rule is applied retroactively. (*Borlik*, *supra*, 194 Cal.App.4th at pp. 40–41.)

[11] This amended version of the instruction first appeared in the Fall 2013 edition of CALCRIM. (CALCRIM No. 1400 (Fall 2013) p. 1173.) Defendant does not claim on appeal that the jury was misinstructed.

23

determination, then defendant was denied his due process right to have his jury determine each fact necessary to his conviction beyond a reasonable doubt.  (*In re Winship* (1970) 397 U.S. 358, 364.)

The instructional omission was not harmless.  The evidence showed unequivocally that defendant was an AH gang member by his own admission on the witness stand. Whether Giovanni was also a member of AH was much more uncertain.

It was unclear from the testimony whether Giovanni joined defendant in making gang challenges to Angel-Esparza before the fight.  Corona told the police the two men who entered the school made remarks commonly understood as gang challenges, but when questioned more specifically, he told them that defendant made the gang challenges and Giovanni just stood there and did not say anything.  Sonato-Vega also told the police he heard gang challenges from the two men who entered the school grounds.  But Sonato-Vega, like Corona, testified at trial he did not hear any gang challenges before the fight. Given that defendant himself told the police Giovanni was "not a banger," the evidence of Giovanni's membership in AH was weak at best.

Whether Giovanni directly participated in the fight is even more doubtful. Defendant told the police that Giovanni was not involved.  Corona testified that only defendant fought with Angel-Esparza, that it was "one on one" and Giovanni stood back about 15 feet and "didn't get involved."  This was consistent with what Corona told the police, and the investigating officer himself referred to Giovanni as "the second person that didn't participate in the fight."  Sonato-Vega also testified the altercation was "just a little fight," a "regular fistfight" with "[j]ust two people fighting."  One of the investigating officers also testified that defendant, during his interview, described running back "toward where his associate was" after the fight ended.  Thus, we see no evidence that Giovanni actually participated in the fight with Angel-Esparza, even if he did participate in making gang challenges.

We conclude, in the end, the evidence of Giovanni's participation in felonious conduct is insubstantial.  Given the absence of instruction on the concept clarified in *People v. Rodriguez*, we see no reason to believe the jury actually deliberated on or

24

resolved this factual issue. Indeed, the gang implications and consequences of the Angel-Esparza homicide appear not to have been easy issues for the jury. After more than 30 hours of deliberation, it convicted defendant of the substantive gang offense under section 186.22, subdivision (a) (count five), but it deadlocked on the gang enhancement under section 186.22, subdivision (b) (1), with respect to the Angel-Esparza homicide (count three).

Defendant's conviction on count five cannot stand because there was no substantial evidence that Giovanni participated in the fight with Angel-Esparza, and it cannot be determined from the record whether the jury actually found that two or more members of defendant's gang participated in felonious conduct on the occasion of the stabbing of Angel-Esparza.

## C.    The abstracts of judgment must be corrected.

Defendant contends the abstract of judgment must be corrected to accurately reflect the trial court's oral pronouncement of judgment, and the Attorney General partially agrees. "Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls." (*People v. Zachery* (2007) 147 Cal.App.4th 380, 385; accord, *People v. Mesa* (1975) 14 Cal.3d 466, 471.) Therefore, we order the abstract of judgment corrected to be consistent with the trial court's oral pronouncement. (*People v. Mitchell* (2001) 26 Cal.4th 181, 186-187.)

The indeterminate term abstract of judgment mistakenly reflects that defendant was sentenced to life without possibility of parole on count two and life with the possibility of parole on count one. We order the indeterminate term abstract to be corrected so that part 4 shows defendant was sentenced to life without possibility of parole on count one and part 5 shows he was sentenced to life with the possibility of parole, stayed, on count two.

Defendant also claims the box on line 6b should be unchecked because it could "erroneously be read" as indicating a second term of 25-to-life was imposed for the firearm enhancement on count two. As we read the abstract, it shows the court imposed

only one unstayed 25-years-to-life term for the firearm enhancement related to count one. No correction is necessary in this regard.

The Attorney General also points out a typographical error on the abstract for the determinate term. That abstract should be corrected to read that the deadly weapon enhancement was committed within the meaning of section "12022(b)(1)," instead of section "1022(b)(1)."

## III.   DISPOSITION

The judgment on count five is reversed, and in all other respects is affirmed. In addition, we remand the case to the superior court, where the clerk shall amend both the determinate and indeterminate abstracts of judgment as indicated in this opinion. A copy of the corrected abstracts of judgment shall be forwarded to the Department of Corrections and Rehabilitation.

_____
STREETER, J.

We concur:


_____
RUVOLO, P. J.


_____
REARDON, J.

27

A138179, *People v. Vega*

People v. Vega (A138179P)

Trial court:              Sonoma County

Trial judge:             Hon. Dana B. Simonds

Attorneys:
David Y. Stanley
under appointment by the Court of Appeal
(Attorney for Defendant/Appellant)

Kamala D. Harris
Attorney General
Dane R. Gillette
Chief Assistant Attorney General
Gerald A. Engler
Masha A. Dabiza
Deputy Attorney General
Margo J. Yu
Deputy Attorney General
(Attorneys for Plaintiff/Respondent – The People of the State of California)