Filed 12/21/23  P. v. Martinez-Gurule CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL MARTINEZ-GURULE,<br><br>        Defendant and Appellant. | A165704<br><br>(Contra Costa County<br>Super. Ct. No. 02003343860) |

Defendant (and appellant) Michael Martinez-Gurule appeals from a judgment of conviction and sentence imposed after a jury found him guilty of committing a lewd act on a child and a forcible lewd act on a child (Pen. Code, § 288, subd. (a), (b)(1)).[1]  He contends the trial court erred by instructing the jury with CALCRIM No. 361, which allowed the jury to consider any failure by Martinez-Gurule to explain or deny certain evidence against him.  We conclude there was no prejudicial error and affirm the judgment.

I.  FACTS AND PROCEDURAL HISTORY

In a Second Amended Information, the Contra Costa County District Attorney charged Martinez-Gurule with four counts of committing a forcible lewd act on a child under the age of 14 years (§ 288, subd. (b)(1)).  The matter proceeded to a jury trial.

---

[1]        All statutory references herein are to the Penal Code.

1

A. <u>Prosecution Case</u>

Martinez-Gurule dated and lived with Jane Doe's mother (Y.) for eight years. He was not Jane Doe's biological father, but he acted as her stepfather and she called him daddy. Born in 2012, she was nine at the time of trial.

Jane Doe testified that Martinez-Gurule had her touch his "private part" on one to five occasions while her mother was at work. Jane Doe did not want to touch his private parts.

The first person Jane Doe told about the touching was her uncle (John Doe, born in 2009) in December 2020.

John Doe testified about that conversation with Jane Doe. She said Martinez-Gurule told her to do something that she did not feel comfortable doing, and "he was trying to force her to do it." It had something to do with Martinez-Gurule's "private part," meaning his penis. Jane Doe asked John Doe not to tell anyone because she did not want Martinez-Gurule to get in trouble. During the conversation, she appeared scared, started crying, and said she did not feel comfortable or safe at home. She informed John Doe that Martinez-Gurule put his penis close to her face.

Two days after talking with John Doe, Jane Doe sent him a TikTok video about what Martinez-Gurule was doing. The video showed an animated male on top of a smaller animated female; a larger animated female walks in, the male quickly gets off the smaller female, and the larger female says, "What?! Are you kidding me? She's a kid bro. You're 22." The video was played for the jury.

Jane Doe's TikTok account was linked to her grandmother's phone number, so the grandmother could view messages sent and received in the account. Jane Doe testified that she sent the video because she wanted her grandmother to know what was happening.

2

Jane Doe's grandmother testified that she saw the video Jane Doe sent to John Doe and a text message telling John Doe that Martinez-Gurule "is like this to me," referring to the video. The grandmother asked John Doe to explain the video. As a result of that conversation, the grandmother spoke to Jane Doe, who said that Martinez-Gurule was telling her to touch his private part. Jane Doe used her hands to demonstrate how he made her touch him. She also cried and said she was sorry for not saying anything earlier.

Law enforcement was notified, and Richmond Police Detective Jaime Guzman arranged for Jane Doe to be interviewed at the Children's Interview Center. A recording of the forensic interview was played for the jury. Jane Doe told the interviewer, Pat Mori, that Martinez-Gurule would "always put his private part up" when her mother was at work. She said "he would always make me touch it," and this took place 19 or 20 times when she was seven or eight years old. Martinez-Gurule would call her, pull his pants down, and make her "touch it." "He would just pull [her] hand and put it on" and would not let her pull her hand away.

Detective Guzman also arranged for Mori to interview John Doe at the Children's Interview Center. A recording of this interview was played for the jury as well. In the interview, John Doe reported that Jane Doe said Martinez-Gurule made her "touch his pri- his spot that no one's supposed to know about." She said she was afraid to get out of her bed to use the restroom because Martinez-Gurule would be awake and naked, and once he told her to go into the bathroom with him and touch "his part that, you know, people aren't supposed to touch if they aren't engaged." Jane Doe told John Doe "that something white would be out of it" and Martinez-Gurule "put his thing" towards her face and wanted her to "touch it and try it" and "put it in

3

her mouth." John Doe confirmed that when he referred to Martinez-Gurule's private area, he was referring to his penis.

After Jane Doe was interviewed, Detective Guzman arranged for Y. to make a pretext call to Martinez-Gurule. They spoke, and after Y. hung up the phone, Martinez-Gurule called her back and they spoke for another 11 or 12 minutes.

That same day, after the pretext call, Martinez-Gurule was interviewed by police detectives. A recording of the interview was played for the jury. After waiving his rights, Martinez-Gurule initially denied having Jane Doe touch his penis. But when a detective said, "as men . . . sometimes we do things and we don't think," Martinez-Gurule replied, "I wasn't thinkin' at all. I don't even know what was in my head at that time." Martinez-Gurule claimed it started when Jane Doe was around five years old and occurred "[j]ust four" times.

Martinez-Gurule recounted for police that the first incident occurred when he was lying in bed, watching TV, and "touchin' [himself] by [himself] for a while." When Jane Doe walked in, he told her to "come here" and had her touch his erect penis. When he realized what he was doing, he "sent her out." After the second time this happened, he apologized to her and said he would never do it again. The third time it happened, he was in the shower and asked her to bring him a towel. By the time she brought the towel, he "was already playing with [himself] before [he] had [Jane Doe] do anything." As for the fourth time, Martinez-Gurule was dressing and had an erection when Jane Doe walked in. He told her to "[c]ome and touch it," and "she did."

At the end of the interview, Martinez-Gurule agreed to write an apology letter to Y. and an apology letter to Jane Doe. In his letter to Jane Doe (which investigators did not deliver to her), he wrote: "[M]y baby girl,

4

daddy is so sorry.  I never meant to hurt you.  I never wanted to put you in harm.  *Daddy did things to you that should not have happened.*  I hope one day I can see you again . . . .  Don't be mean to [B.].  Take care of your brother.  Be a good girl for mommy . . . .  I'll be gone for a while but know I'm in your heart forever.  I miss you and love you so much.  Your daddy."  (Italics added.)

B. <u>Defense Case</u>

Martinez-Gurule testified that the molestation allegations were untrue and that he never showed Jane Doe his penis or had her touch it.  Although he told Y. in the pretext call that he had Jane Doe touch his penis on four occasions, he claimed he said that only because he was stressed and Y. had told him he would not see the children again unless he confessed.  Similarly, while he admitted to police that there were four occasions when Jane Doe touched his penis, he claimed he made the admission because the authorities were threatening to take away the children, and he thought that if he confessed, they might not take them away from Y. at least.  He acknowledged telling officers the details about the first molestation.  He acknowledged telling officers that on the third occasion of molestation, he had been in the shower and told Jane Doe to come and touch it, and demonstrating to those officers how he had Jane Doe grip his penis.  He acknowledged writing the apology letter to Jane Doe, telling her he was sorry for what he had done, but he claimed the letter was untrue.

C. <u>Jury Verdict and Sentence</u>

The jury found Martinez-Gurule guilty of the lesser offense on count 1 of committing a lewd act on a child (§ 288, subd. (a)) and guilty on count 3 of committing a forcible lewd act on a child (§ 288, subd. (b)(1)).  The jury was

5

unable to reach a verdict on the remaining counts, which were dismissed after the prosecution elected not to retry them.

Martinez-Gurule was sentenced to state prison for 10 years, based on the mid-term of 8 years on count 3 and two years (one-third the mid-term) on count 1. He filed a timely notice of appeal.

## II. DISCUSSION

Martinez-Gurule contends the trial court erred by instructing the jury with CALCRIM No. 361, which provides that the jury may consider a defendant's failure to explain or deny adverse evidence within his knowledge. He fails to establish reversible error.

Defense counsel had opposed the prosecution's request to give CALCRIM No. 361 because he could not "recall what it might apply to." The trial court believed "there could be an argument that not everything was explained in [Martinez-Gurule's] testimony," but defense counsel countered that he had not failed completely to explain or deny the evidence. Noting that Martinez-Gurule had not explained the TikTok video, the court observed that the prosecution could argue that he lacked a good explanation for things even if the instruction was not given, and the instruction said a failure to explain or deny the evidence was not enough to prove guilt. The court therefore ruled: "I'll give it. If it doesn't apply—the jury finds facts that it doesn't apply, then it doesn't apply."

Consistent with CALCRIM No. 361, the jury was instructed: "If the defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence. [¶] Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt. If

6

the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

In determining whether a CALCRIM No. 361 instruction was improper, we " 'ascertain if [the] defendant . . . failed to explain or deny any fact or evidence that was within the scope of relevant cross-examination' and was 'within [the defendant's] knowledge which he did not explain or deny.' " (*People v. Grandberry* (2019) 35 Cal.App.5th 599, 606; see *People v. Cortez* (2016) 63 Cal.4th 101, 117 (*Cortez*) [instruction "applies only when a defendant completely fails to explain or deny incriminating evidence, or claims to lack knowledge and it appears from the evidence that the defendant could reasonably be expected to have that knowledge"].) Testimony from the defendant that is merely vague, improbable, or unbelievable is not enough to support the giving of the instruction. (*Cortez*, at p. 117.)

Martinez-Gurule urges that there was no fact or evidence he completely failed to explain or deny and that he did not claim a lack of knowledge about something he could reasonably be expected to know. Respondent counters that Martinez-Gurule failed to explain why he did not ask police, during his interview, what would happen to the children, even though his supposed reason for confessing to the sexual abuse was to avoid having them taken away from him or Y. Respondent further argues that Martinez-Gurule did not explain the TikTok video that Jane Doe sent to John Doe.[2] We need not decide whether this provided a sufficient basis for giving CALCRIM No. 361, because even if it was error to give the instruction, the error was harmless.

---

[2]     In closing argument, the prosecutor referred briefly to the instruction, asserting that Martinez-Gurule failed to explain corroborating evidence such as the TikTok video.

To obtain a reversal, Martinez-Gurule must show a reasonable probability that he would have obtained a more favorable result at trial if the instruction had not been given.  (See *People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Saddler* (1979) 24 Cal.3d 671, 683–684 (*Saddler*) [assessing the harmlessness of an instruction under CALJIC 2.62, the precursor to CALCRIM No. 361].)  He failed to do so.

CALCRIM No. 361 is a conditional instruction, leaving it to the jury to determine, based on the jury's view of the evidence, whether the instruction applies.  In particular, the instruction informed the jury that *if* Martinez-Gurule failed to explain or deny evidence and *if* he could reasonably be expected to have done so based on what he knew, the jury could (but need not) consider his failure to explain or deny that evidence in evaluating its weight.  In addition, the trial court instructed the jury, pursuant to CALCRIM No. 200, that "[s]ome of these instructions may not apply, depending on your findings about the facts of the case," the jury should "not assume just because [the court gave] a particular instruction that [the court was] suggesting anything about the facts," and after deciding the facts the jury was to "follow the instructions that do apply to the facts as you find them."  We presume the jury followed CALCRIM No. 200.  (*People v. Cain* (1995) 10 Cal.4th 1, 34.)  Thus, if CALCRIM No. 361 was given erroneously because Martinez-Gurule had not failed to deny or explain adverse evidence within his knowledge, the jury would have disregarded the instruction; any error in giving it was therefore harmless.  (*Saddler, supra*, 24 Cal.3d at p. 684; *People v. Lamer* (2003) 110 Cal.App.4th 1463, 1472 (*Lamer*) ["courts have routinely found that the improper giving of CALJIC No. 2.62 constitutes harmless error" in light of its text and another CALJIC instruction mitigating its prejudicial effect]; *People v. Vega* (2015) 236 Cal.App.4th 484,

503 (*Vega*) [CALCRIM No. 200 mitigated any prejudice from giving CALCRIM No. 361].)

Furthermore, if the jury *did* find that CALCRIM No. 361 applied, the instruction makes clear that the defendant's failure to explain or deny evidence "is not enough by itself to prove guilt" and that the prosecution "must still prove the defendant guilty beyond a reasonable doubt." Rather than requiring the jury to draw an adverse inference, the instruction leaves it to the jury to "decide the meaning and importance" of the defendant's failure to explain or deny. (*People v. Ballard* (1991) 1 Cal.App.4th 752, 756–757; *Lamer, supra*, 110 Cal.App.4th at p. 1472; *Vega, supra,* 236 Cal.App.4th at pp. 502–503.)

Finally, overwhelming evidence supported counts 1 and 3, whether the jury was instructed with CALCRIM No. 361 or not. Jane Doe told the jury under oath that Martinez-Gurule had her touch his "private part" up to five times. John Doe testified that Jane Doe told him about the touching and that it was "kind of forced." Her grandmother testified to Jane Doe's tearful disclosure that Martinez-Gurule had her touch his private parts. In their recorded forensic interviews, played for the jury, Jane Doe described the molestation and John Doe reported Jane Doe's statements about it. Martinez-Gurule admitted during a pretext call with Y. that he had Jane Doe touch his penis four times. He confessed to police that he molested Jane Doe four times, giving details about at least two of them. His apology letter, which he intended to go to Jane Doe, admitted he "did things to [her] that should not have happened." His sole excuse for confessing his crimes to Y. and the police was that he thought he would not be able to see Y. and Jane Doe unless he confessed. A jury likely found this excuse not credible. In fact, both in his apology letter and in his police interview, he acknowledged he was

9

not going to go home to see Jane Doe even though he *had* confessed. Ample evidence pointed to Martinez-Gurule's guilt on the counts for which he was convicted.

Martinez-Gurule argues that the instruction may have influenced the jury because this was a "close" case, noting the jury hung on two of the four counts and one of his convictions was for a lesser offense. The jury's inability to reach a verdict on counts 2 and 4, however, does not mean there was a close call as to counts 1 and 3. The jury may have reasonably concluded that the evidence supporting counts 1 and 3 was more detailed and persuasive. At any rate, we find no reasonable probability that Martinez-Gurule would have obtained a more favorable outcome if CALCRIM No. 361 had not been given.

### III. DISPOSITION

The judgment is affirmed.

                              CHOU, J.


We concur.



JACKSON, P. J.
SIMONS, J.








*People v. Martinez-Gurule* / A165704