Filed 9/25/24  P. v. Shade CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JAMES PATRICK ANGELO SHADE,<br><br>Defendant and Appellant. | C098843<br><br>(Super. Ct. No. 62-178250) |

Defendant James Patrick Angelo Shade was abused physically and psychologically by his father Larry S.[1] (Larry) for many years.  On March 14, 2021, defendant stabbed Larry multiple times, killing him.  A jury found defendant guilty of murder in the first degree and found true the enhancement allegation that, in committing

---

[1]    To protect their privacy, we refer to the victim by his first name and last initial and witnesses by their initials.  (Cal. Rules of Court, rule 8.90(a)(1), (b)(4)(10), (11)).

1

the murder, defendant personally used a deadly or dangerous weapon. The trial court sentenced defendant to 25 years to life plus one year in state prison.

On appeal, defendant asserts: (1) the trial court prejudicially erred in instructing the jury with CALCRIM No. 361 on constitutional grounds and because it was not supported by substantial evidence; (2) the trial court erred by shifting the burden of proof when it instructed the jury on murder and voluntary manslaughter; (3) the cumulative effect of these errors was prejudicial; (4) the trial court should have struck the enhancement; and (5) the abstract of judgment must be corrected to accurately reflect the sentence imposed by the trial court. Agreeing only with the last point, we will affirm the judgment and order the abstract of judgment corrected.

## BACKGROUND

An information charged defendant with murder (Pen. Code, § 187, subd. (a); count one)[2] and alleged that, in the commission of the murder, defendant personally used a deadly or dangerous weapon (§ 12022, subd. (b)(1)).

### *Relevant Portions of the Prosecution Case*

### *Relevant Events Preceding Larry's Death*

In 2014, law enforcement responded to Larry's house and encountered defendant, Larry, and Larry's sister L.N. Larry had fresh abrasions on his face and forehead. He told an officer defendant punched him and the officer arrested defendant for battery. Defendant told the officer that Larry had grabbed his medication and held it behind his back, taunting him.

Also in 2014, defendant was admitted to a psychiatric facility under Welfare and Institutions Code section 5150. While he was there, staff determined that they were compelled to warn Larry of threats defendant was making against him, sometimes

---

[2]    Undesignated section references are to the Penal Code.

2

referred to as "*Tarasoff* warnings." (See *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425.) Defendant had stated, "[H]e wants to violently kill his father, bash his skull in to the point when he sees the man bleed, and he would like to see his lungs and his brain taken out of his body."

Defendant was admitted to a psychiatric facility again in 2016, after which another *Tarasoff* warning was given based on "[s]everal quite credible and serious threats." Defendant was making threats involving taking a neighbor's gun and using it to kill Larry and defendant's uncle. Alternatively, defendant said, "he could use a knife as a weapon . . . ."

In May 2019, Roseville Police Officer Michael Ryland responded to a vandalism report and found Larry's car severely damaged. Both windshields were broken, every surface of the car was dented, and there was a large rock on the hood. When Officer Ryland later encountered defendant, he admitted that he had damaged the car because he was upset that Larry would not pick him up from the hospital. Officer Ryland arrested defendant.

A.A. was friends with Larry and, as a housekeeper, would help clean his house in Roseville. One evening in February 2021, she was at Larry's house when defendant came over. The two men argued and yelled at each other. Defendant threw a glass marijuana pipe on the floor and the pipe broke.

On February 10, 2021, defendant spoke on the phone with his sister T.S., who was in jail at the time, and a recording of the call was played for the jury. Defendant told T.S. that he "paid [Larry] a visit last night and I scared him pretty good," and that Larry "called the cops on" him. He elaborated that he cursed at Larry, cursed at "whoever that lady was . . . . I called her a dumb bitch. And he's like, 'Call the police. . . .' I was like, 'Yeah, call them, you dumb fucking bitch. Call them, you stupid slut." Defendant told T.S. that, at the time, he had a "pipe wrench in my pocket. I could have just smashed him in the fucking head." Defendant told T.S. that Larry had reported that defendant was

3

verbally attacking them, and defendant told T.S. that it "made me so sick when I heard that. I could have just fucking took his life that night." Defendant reported that, after leaving, he had gone back for gas money. He recalled getting into the woman's face because "it's like she wanted to witness me murder this guy in front of her." He stated that he "would have killed her, too . . . ."

Larry's nephew, defendant's cousin, G.A., described a time in February 2021 when he accompanied Larry to his property in Paradise where defendant was living in a trailer. Larry knocked on the door of the trailer and walked in and defendant "got super upset" and yelled at Larry. Later, the three of them drove to a store to exchange propane tanks, while defendant's anger simmered. He told both Larry and G.A. that they made him sick. When they arrived at the store, defendant jumped out of the car and stormed off. Larry called the police, and then he and G.A. returned to the trailer. Defendant and Larry continued to argue. G.A. heard defendant say to Larry, "You make me so sick. I could just kill you" or something similar.

*Larry's Death*

On March 14, 2021, Larry's next-door neighbors in Roseville heard someone calling for help. The husband went outside and saw Larry sitting on their porch swing, bleeding considerably and unresponsive, and he told his wife to call 911. A Roseville police officer arrived at 5:50 p.m. and began to perform CPR. A paramedic subsequently arrived and, ultimately, pronounced Larry dead.

A neighbor reported that, at about 4:00 or 5:00 p.m., she saw a silver/gray/blue Honda CRV pulling out of her driveway and speeding away. Traffic camera footage established that, between 5:39 and 5:42 p.m., a silver Honda CRV consistent with a vehicle connected to defendant was traveling towards the area where Larry's street was located, which was also consistent with defendant's cell phone location data. At 5:44 and 5:46, defendant's cell phone was on or near the street on which Larry lived. Additional

4

cell phone data and traffic camera footage indicated the Honda CRV and defendant's cell phone were traveling away from the area of Larry's street between 5:53 and 5:59 p.m.

At 6:32 p.m., defendant's cell phone was in the area of a gas station in Marysville. A detective reviewed surveillance footage at the gas station. The silver/gray Honda CRV was at that location at approximately 6:30 p.m. Defendant also appeared in the video. At the gas station, he purchased a single rose and a cell phone charger.

Back at Larry's house, law enforcement found a temporary domestic violence restraining order. Larry was the party restrained and defendant and M.S., defendant's mother and Larry's former wife, were the protected parties. Law enforcement also found a 12-gauge shotgun and a .22-caliber rifle in Larry's bedroom. Larry also had a third gun registered to him, a .22-caliber pistol.

The forensic pathologist who performed the autopsy on Larry testified that he had suffered at least 20 sharp-force wounds, such as from a knife, on his abdomen, torso, back, and arms. Twelve of the injuries were to his front and nine were to his back. A wound to the chest that penetrated the right lung and a wound to the back that penetrated the diaphragm and the stomach each could have been fatal. Another wound to the back was about four inches deep and resulted in two penetrations of the heart. This wound was fatal. Larry died as a result of multiple sharp-force injuries.

*A Sampling of Electronic Communications*

Detective Chris Uribe testified about text messages exchanged between defendant's cell phone and Larry's cell phone. On February 2, 2021, defendant sent text messages to Larry, including messages stating, "You take all my f'ing money"; "God you talk about the police like they are your f'ing bodyguards. Get a grip, old man"; "It's getting hard to respect you, Larry"; "you're more loyal to your friends than your own family f'ing piece of shit"; "I'm your f'ing son"; "Treat me better you f'ing . . . ass"; "I swear you make me sick"; "I swear I f'ing hate you"; "Where the F were you my whole life"; and "You're such an f'ing piece of shit."

In a January 31, 2021, text message to M.S., defendant stated, "I will most likely lash out and go back to the mental facility or jail."

On February 8, 2021, defendant sent a text message to M.S. stating, "I scared him and his housemaid. I went back for some money. I told him he'll never meet my wife or kids. I think today I lost respect for him. He is a coward. He calls the police like they're his bodyguards. He is the biggest pussy I know. I wouldn't miss him when he died. If he had sense, he would just stay away from me because I might end up hurting him." The text message continued, "That dumb . . . bastard just fucking stood there looking stupid. When I went back, she was gone. I didn't break nothing except for my own pipe." In a group text message chat on February 9, 2021, defendant stated, "Today I scared my father and his housekeeper. He is lucky I didn't steal his life and hers. Dumb bitch." Later in the group text message chat, defendant stated, "She was gone when I came back. He was like, 'You really scared her.' I was like, 'You think I give a fuck.' I swear guys. I might lose my cool one day."

In a series of text messages to his mother M.S., defendant stated, "I don't want to go to jail, but I am not scared to go"; "I would regret it most likely"; "I don't want to lose my dogs again. Shame on Larry"; and "I will not miss him when he dies." He later continued, "I know he is garbage, not a real man. I don't respect him."

*Psychological Evaluation*

Dr. Deborah Schmidt, a licensed psychologist, was appointed by the trial court to evaluate defendant. Defendant described a rough childhood, characterizing Larry as physically, mentally, and emotionally abusive. Defendant felt that Larry treated him like he hated him and like defendant was not his son. Defendant recounted that, when he had chicken pox as a child, Larry popped a blister on his chest, literally scarring him for life. Larry was also abusive towards M.S.

Once when defendant was living with Larry, Larry was watching pornography which made defendant uncomfortable, so defendant smashed Larry's laptop with a

6

dumbbell. This resulted in the first of defendant's psychiatric hospitalizations. When he was released, he called Larry to pick him up, but Larry refused, so defendant smashed Larry's car windows with rocks and threw urine in Larry's car and, as a result, went to jail. When he got out, defendant lived in a van with M.S. and their dogs. Later, defendant and M.S. lived in a trailer on Larry's property, where Larry would periodically "pop in" to check on them and search defendant's room. On one occasion, Larry told defendant that if defendant's dogs bit him, Larry would shoot the dogs.

Defendant told Dr. Schmidt that, on the day he killed his father, he was driving from Paradise to Roseville to serve Larry with the restraining order. He had a knife with him in case G.A. tried to stop him from serving Larry. Defendant told Dr. Schmidt he had been feeling very angry and he started thinking he would kill his father. When defendant arrived at the house in Roseville, he could hear Larry whistling. This further angered defendant. Defendant knocked on the door and, when Larry answered, defendant gave him the restraining order. Larry asked what it was and defendant responded, "What the F does it look like?" "Then [defendant] said when his father looked like he was caught off guard, he pulled the knife out and stabbed him in the lower right stomach area with his left hand. [¶] So he explained that in his head, he either heard himself or a voice saying[,] 'He will die if you do it with your left hand.' " Larry fell to the ground, defendant jumped on him, and defendant stabbed him again. Defendant told Larry that he hated him because he had ruined his life. Larry got up and defendant stabbed him in the back. Defendant then put his knife in his pocket and drove off. He did not remember stabbing Larry more than three times. Defendant told Dr. Schmidt he knew he should have left after handing Larry the restraining order, "but he thought that [Larry] would keep bothering them. And he had had it with him because [Larry] was mean and abusive. And he . . . felt like he was protecting his mother, dogs, and sister. And he was upset that [Larry] had come over and terrorized them and then was happy the next day."

7

Dr. Schmidt testified that defendant never told her that Larry did anything that made defendant feel he needed to use self-defense or that he felt a need to defend himself.

Defendant reported to Dr. Schmidt that, as he was driving away from the area, "he saw an ambulance coming with its lights on, and he thought of crashing into it so that his father would have no chance . . . ." The next day, defendant disposed of his clothing and boots in a trash container. He knew that killing Larry was wrong, but "he feels that he got even with him, 'which makes us equal.' "

Dr. Schmidt diagnosed defendant with schizoaffective disorder, post-traumatic stress disorder, and cannabis, amphetamine, and opioid-use disorder.

*Relevant Portions of the Defense Case*

*Defendant's Testimony*

According to defendant, who was 32 years old at the time of trial, he was abused physically, verbally, and psychologically by Larry, as were M.S. and T.S. Larry would hit M.S. and lock her in her room, disparage her, call her names, and scream at her. On one occasion, Larry picked M.S. up and threatened to throw her out a window. On another occasion, Larry pointed a gun at T.S. Larry would also grab T.S. by her hair and around her throat.

Defendant had a keloid—a scar with thick tissue—on his chest. Beginning when defendant was four years old, Larry would frequently pinch defendant, causing or exacerbating the scar. Because of the scar, defendant had a very poor self-image. Larry would also slap defendant and hit him with a belt. Larry had told defendant that he had a gun and, "don't do anything stupid." Additionally, when defendant was a child, Larry would give him Norco, Vicodin, Valium, and marijuana.

Defendant testified that there was a pink trailer, a shed, and a white "fifth wheel" on Larry's property in Paradise where defendant and M.S. lived. When they first moved

8

there, defendant and M.S. lived in their vans. Later, defendant moved into the white trailer and M.S. moved into the shed.

In February 2021, Larry and G.A. came to the property and Larry started searching the trailer, making defendant feel like Larry was invading his privacy. They yelled at each other. They then went to the store for propane. During the drive, Larry told defendant he had to move, and told him to " 'take your circus down the road.' " When they stopped the car, defendant got out and walked home. Defendant thought G.A. wanted to fight him. G.A. was much bigger than defendant and was a violent person. Also in February 2021, Larry told defendant that if defendant's dog bit him, Larry would shoot both of his dogs in the head.

On March 14, 2021, defendant smoked marijuana. M.S. asked him to serve Larry with the restraining order. Defendant grabbed his knife in case G.A. was at Larry's house and wanted to fight.

Defendant was upset while driving to Larry's house. As he neared the house, defendant started thinking about killing Larry. He thought about using the knife to stab Larry. Defendant arrived at about 5:00 p.m. He heard Larry whistling, which made defendant angry because he sounded so happy, and defendant and M.S. were so miserable.

Defendant knocked and Larry came to the door. Defendant handed Larry the restraining order and Larry asked, " 'What the fuck is this supposed to be?' " Defendant responded, "What the fuck does it look like." Larry was holding the restraining order with his left hand. He moved his right hand behind his back to the waist of his pants. Defendant knew Larry had guns and he thought Larry was going to pull out a gun like he had done with T.S. Defendant felt threatened. Defendant took the knife out of his pocket and "stuck it inside two times." Larry stepped back, the two fought in the dining room, Larry grabbed defendant's jacket and fell backwards, and defendant fell on top of him. Defendant feared Larry was going to get his gun and shoot him. At this moment,

9

defendant's history of trauma with Larry was rushing back to him. Defendant stabbed Larry twice more in the chest. Larry got up and started walking towards a hallway, and defendant stabbed him twice in the back. Then, defendant ran to his car and drove away. He threw the knife out of the car window because he did not want to be caught with it.

Defendant testified that, when he stabbed Larry, he believed he was defending himself. On cross-examination, he testified that, when he met with Dr. Schmidt, he did not think it was important to mention that he had seen Larry's hand go behind his back. When asked why he failed to tell therapist Dr. Linda Barnard about Larry reaching behind his back, defendant testified that he did not "think [he] remembered it." Defendant acknowledged passing an ambulance and thinking about crashing into it so that Larry would not get help.

*Testimony of Family Members*

M.S., T.S., and others described a family riven by years of abuse, violence, and intimidation at Larry's hands. M.S., who divorced Larry in 1997, and T.S. both testified about the physical, verbal, psychological, and financial abuse Larry inflicted on all of them. Both testified that they observed Larry being abusive toward defendant and the rest of the family. According to T.S., Larry "was abusive every day."

T.S. recalled that Larry, high on methamphetamine, would pick at her and defendant's chicken pox marks until they would bleed, then scar, then turn into keloids. Larry would push and kick the children, lift them off the ground by their hair, and slap them. He would throw them across the room and into walls. Larry called defendant a "[p]iece of shit," stupid, and lazy, and told him he was not "going to be anybody in life." Both T.S. and M.S. testified that Larry would give defendant marijuana and pharmaceutical drugs when he was a child. Larry also abused M.S. physically, and would threaten to kill her. Once, Larry lifted M.S. up and threatened to throw her out of a second-story window. Larry pointed a handgun at T.S. Larry's sister L.N., and his cousin

also testified they had witnessed Larry being abusive to defendant.  The abuse began when defendant was small and continued "[a]ll his life."

There was a time defendant and his siblings were removed from their home and moved in with relatives.  Defendant stayed the longest, living with the relatives for several years.

*Expert Testimony on Family Violence and Intimate Partner Battering*

Dr. Linda Barnard, who specializes in working with trauma survivors, testified as an expert in family violence and intimate partner battering.  Dr. Barnard agreed with Dr. Schmidt's diagnosis that defendant suffered from post-traumatic stress disorder and opined that defendant was a battered person.  Dr. Barnard testified that defendant suffered physical, verbal, emotional, and financial abuse from Larry.  Defendant lived in fear with minimal means to get away from the danger posed by Larry.  Dr. Barnard testified that a person with a history of trauma may anticipate experiencing new trauma, and that person's brain may react based on the history of trauma rather than based on the actual situation at hand.  Dr. Barnard testified that defendant's conduct was consistent with someone with a heightened sense of fear.  Dr. Barnard did not recall defendant telling her that Larry moved his right hand, that he thought Larry was reaching for a gun, or that defendant was afraid Larry was going to shoot him.

*The Prosecution's Rebuttal*

Deputy Matthew Byers worked in the Auburn jail in June 2019.  On one occasion, when defendant was removed from his cell, he charged to another cell, screaming to the inmate in that cell that "he was going to slit her throat, and that he would . . . find her children and murder them."  Defendant told Deputy Byers that, when he was released, he would shoot Byers in the head, find Byers's family, and kill them too.  Deputy Byers had received hundreds of threats from inmates and people he arrested, but defendant was the only person he personally charged with a crime for threats.  Deputy Byers "was legitimately fearful that he would try to . . . follow through with his threats."

11

Deputy William Martinez testified that, when defendant was in Placer County jail in October 2021, defendant activated his intercom, said he wanted to hit his cellmate, and requested a new cellmate. Deputy Martinez responded to defendant's cell and saw defendant repeatedly punching his cellmate, who was not fighting back.

*Verdict and Sentencing*

The jury found defendant guilty of murder in the first degree and found true the enhancement allegation that defendant personally used a deadly or dangerous weapon. The trial court sentenced defendant to 25 years to life for first degree murder and to one additional year for the personal use of a deadly or dangerous weapon enhancement.

DISCUSSION

I

*CALCRIM No. 361*

A. *Additional Background*

Over the defense counsel's objection that it was not supported by the evidence, the trial court instructed the jury with CALCRIM No. 361 as follows: "If the defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt. [¶] If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

B. *Constitutional Challenge*

Defendant argues the trial court erred in instructing the jury with CALCRIM No. 361 on constitutional grounds because the instruction interferes with a defendant's rights to testify and to a fair trial. He asserts the instruction singles out the defendant's testimony, subjects it to "unique and special scrutiny," and violates the precept that the jury " 'must judge the testimony of each witness by the same standards.' " (CALCRIM

12

No. 226.)  Defendant contends that CALCRIM No. 361 has a chilling effect on criminal defendants, whose testimony will be subject to heightened scrutiny.

In light of defendant's contention that CALCRIM No. 361 violated his substantial rights (see § 1259), we will review the merits of his constitutional claim even though he did not raise it in the trial court (see *People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249 [ascertaining whether a claimed instructional error affected the defendant's substantial rights requires an examination of the merits of the claim]).

"A claim of instructional error is reviewed de novo."  (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)  In *People v. Saddler* (1979) 24 Cal.3d 671 (*Saddler*), our Supreme Court rejected the defendant's constitutional challenges to CALJIC No. 2.62, predecessor to CALCRIM No. 361, holding that CALJIC No. 2.62 "suffers no constitutional or other infirmity."  (*Saddler, supra*, at p. 675.)  Among other things, our Supreme Court rejected the defendant's contention that the instruction violated his privilege against self-incrimination.  (*Id*. at pp. 678-679.)  The Supreme Court further concluded that CALJIC No. 2.62 did not deprive the defendant of the presumption of innocence or reverse or diminish the burden of proof infringing on the defendant's due process rights.  (*Saddler, supra*, at p. 680.)  Addressing the defendant's contention that the instruction improperly singles out a defendant's testimony, a contention defendant raises here, the Supreme Court noted that in *People v. Mayberry* (1975) 15 Cal.3d 143, it had rejected the same argument, and explained "that the instruction was consistent with Evidence Code section 413 which permits the drawing of inferences from any party's failure to explain or deny evidence against him.  Since the only testifying 'party' in a criminal case is the defendant, the code section can have reference only to him."  (*Saddler, supra*, at pp. 680-681, fn. omitted.)

More recently, in *People v. Rodriguez* (2009) 170 Cal.App.4th 1062, the Court of Appeal rejected constitutional challenges to CALCRIM No. 361.  Following the reasoning of *Saddler*, the court rejected the defendant's claim based on the presumption

of innocence and the burden of proof, finding the Supreme Court's reasoning in *Saddler* "applies with equal force to CALCRIM No. 361 . . . ." (*Rodriguez, supra*, at pp. 1066-1067.) The *Rodriguez* court also rejected the defendant's claim echoed by defendant here: "Appellant argues that California standardized jury instructions do not treat a testifying defendant ' "the same . . . as . . . any other witness," ' a factor identified by the United States Supreme Court in *Caminetti v. United States* (1917) 242 U.S. 470, 493 in allowing the jury to consider a defendant's failure to explain or deny incriminating acts in deciding guilt. The *Saddler* court rejected a similar argument that CALJIC No. 2.62 should never be given because it 'impermissibly singles out a defendant's testimony and unduly focuses upon it.' " (*Id*. at p. 1067.) The *Rodriguez* court recounted the Supreme Court's discussion in *Saddler* of *People v. Mayberry, supra*, 15 Cal.3d 143, and concluded that the "same reasoning applies with equal force to CALCRIM No. 361, which is consistent with Evidence Code section 413." (*Rodriguez, supra*, at p. 1067.) The Court of Appeal found "no constitutional infirmity in the instruction." (*Id*. at p. 1068.)

Even more recently, in *People v. Vega* (2015) 236 Cal.App.4th 484, 495-500 (*Vega*), the Court of Appeal rejected the other arguments defendant raises here, that CALCRIM No. 361 violated his right to testify and the due process right to a fair trial. (*Vega, supra*, at pp. 496-500.) The court in *Vega* saw "no inconsistency between defendant's right to testify and the attendant risk of being confronted with evidence calling into question his testimony." (*Id*. at p. 496.) Among other things, the court stated: "[W]hen a defendant does testify, all bets are off. He waives his Fifth Amendment privilege [citation] and is subject to cross-examination just as any other witness is." (*Id*. at p. 497.) The court rejected the contention, raised here, that CALCRIM No. 361 may have a " 'chilling effect' " on defendants who would otherwise testify, finding it "unlikely that CALCRIM No. 361 would have that effect beyond the ever-present prospect of facing cross examination." (*Vega, supra*, at p. 498.) The court also rejected the

contention that CALCRIM No. 361 violated a defendant's right to a fair trial by singling him out for treatment different than that of other witnesses, noting this claim had been rejected in both *Saddler* and *Rodriguez*. (*Vega, supra*, at pp. 498-499.)

Defendant acknowledges *Saddler* and *Rodriguez*. However, he asserts these conclusions "must be re-examined," and he also purports to cast "a somewhat different light on the problem." Between *Saddler*, *Rodriguez*, and *Vega*, all of defendant's constitutional arguments have been considered and rejected. No published case has disagreed with *Rodriguez* or *Vega* on their analyses of these constitutional challenges to CALCRIM No. 361. Defendant has failed to offer any convincing reason why we should depart from these cases, and we decline to do so. We are persuaded these cases were correctly decided.

Defendant questions why CALCRIM No. 361 exists as a separate instruction, maintains that its concepts should be incorporated into CALCRIM No. 226 so as to instruct jurors to assess witness testimony in a neutral manner, and questions whether Evidence Code section 413 is properly applicable to a criminal case. All of these points were raised by the defendant in *Vega*. (*Vega, supra*, 236 Cal.App.4th at p. 499.) As that court stated: "These arguments are more appropriately pitched to the Legislature and the Judicial Council. We decline the invitation to engage in wholesale revision of the CALCRIM instructions and selective disabling of the Evidence Code in criminal cases just to avoid a hypothetical 'chilling effect' on other defendants." (*Id*. at pp. 499-500.)

C. *CALCRIM No. 361 and Substantial Evidence*

Defendant also argues that CALCRIM No. 361 was not supported by substantial evidence. As a general matter, a " 'trial court must give a requested instruction only if it is supported by substantial evidence, that is, evidence sufficient to deserve jury consideration.' " (*People v. Leon* (2020) 8 Cal.5th 831, 848.) Defendant argues that he explained or denied all pertinent facts.

"CALCRIM No. 361 rests on the logical inference that if a person charged with a crime is given the opportunity to explain or deny evidence against him or her but fails to do so, then that evidence may be entitled to added weight." (*People v. Grandberry* (2019) 35 Cal.App.5th 599, 605.) CALCRIM No. 361 "applies only when a defendant completely fails to explain or deny incriminating evidence, or claims to lack knowledge and it appears from the evidence that the defendant could reasonably be expected to have that knowledge." (*People v. Cortez* (2016) 63 Cal.4th 101, 117.) "Where a defendant's testimony contradicts or stands in conflict with the state's evidence, such 'contradiction is not a failure to explain or deny.' " (*Grandberry, supra*, at p. 606, quoting *Saddler, supra*, 24 Cal.3d at p. 682.) "Nor is the instruction appropriate even when a defendant's testimony may seem 'improbable, incredible, unbelievable, or bizarre.' " (*Grandberry, supra*, at p. 606, quoting *Cortez, supra*, at p. 117.) "Accordingly, the task of the reviewing court in examining a claim that a CALCRIM No. 361-based jury instruction was improperly given is 'to ascertain if [the] defendant . . . failed to explain or deny any fact of evidence that was within the scope of relevant cross-examination' and was 'within [the defendant's] knowledge which he did not explain or deny.' " (*Grandberry, supra*, at p. 606, quoting *Saddler, supra*, 24 Cal.3d at p. 682.)

The prosecution's rationale for requesting CALCRIM No. 361 was what it deemed to be defendant's failure to explain why he did not tell Dr. Schmidt or Dr. Barnard that, when he gave Larry the restraining order, Larry moved his right hand behind his back, causing defendant to fear he was reaching for a gun. About his interview with Dr. Schmidt, the prosecutor asked defendant on cross-examination, "[Y]ou didn't think it was important to mention that you saw your father's hand go behind his back," and defendant responded, "No." Then the prosecutor asked: "[Y]ou didn't tell Dr. Barnard, what you're telling this jury today, about your father's hand going up behind his back, did you," and defendant responded, "No." The prosecutor probed, "You didn't think that that

16

was an important fact to tell Dr. Barnard?"  Defendant replied, "I don't think I remembered it."

Defendant's explanations could be characterized as " 'the functional equivalent of no explanation at all.' "  (*People v. Cortez, supra*, 63 Cal.4th at p. 117.)  Conversely, they could be labeled "improbable, incredible, unbelievable, or bizarre," while still purporting to explain inculpatory evidence.  (*Ibid*.)  Regardless, we will conclude that any error in giving this instruction was harmless.

D.  *Prejudice*

Defendant argues that we must apply the *Chapman v. California* (1967) 386 U.S. 18 standard to determine whether any error in giving this instruction was harmless beyond a reasonable doubt.  However, defendant's contention is premised solely on his constitutional challenges to CALCRIM No. 361, all of which we have rejected.  Courts have applied the harmless error standard of *People v. Watson* (1956) 46 Cal.2d 818, when reviewing claims of instructional error pertaining to CALCRIM No. 361 and CALJIC No. 2.62.  (*Saddler, supra*, 24 Cal.3d at p. 683; *People v. Roehler* (1985) 167 Cal.App.3d 353, 393 [*Saddler* and later cases hold "rather uniformly" that if CALJIC No. 2.62 was erroneously given, *Watson* provides the appropriate standard to assess prejudice]; see also *Vega, supra*, 236 Cal.App.4th at p. 501 [under either *Chapman* or *Watson*, the error in giving CALCRIM No. 361 was harmless].)  Defendant makes no other argument, and cites no authority, to justify the application of the *Chapman* standard.  We proceed to consider under *Watson* whether it is reasonably probable that defendant would have achieved a more favorable result had this instruction not been given.  (*Watson, supra*, at p. 836.)

The trial court instructed the jury that not all of its instructions were necessarily applicable.  (CALCRIM No. 200; see *Vega, supra*, 236 Cal.App.4th at p. 503 [instructing the jurors with CALCRIM No. 200 mitigated any prejudicial effect related to giving CALCRIM No. 361 if it were deemed improper].)  Thus, if CALCRIM No. 361 was

17

given erroneously because defendant had not failed to explain or deny adverse evidence within his knowledge, the jury would have disregarded the instruction. The language of CALCRIM No. 361 itself further mitigates against prejudice by instructing the jury its application is conditioned upon the jury first finding that defendant failed to explain or deny evidence.

Even if the jury did find that CALCRIM No. 361 applied, the instruction makes clear that the defendant's failure to explain or deny evidence "is not enough by itself to prove guilt" and that the prosecution "must still prove the defendant guilty beyond a reasonable doubt." (CALCRIM No. 361.) Rather than requiring the jury to draw an adverse inference, the instruction explained that it was up to the jurors "to decide the meaning and importance" of any failure to explain or deny evidence. We presume the jury followed the trial court's instructions "in the absence of any indication it was unwilling or unable to do so." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 196.)

Furthermore, overwhelming evidence supported the jury's verdict and true finding. Defendant admitted stabbing Larry. Larry suffered at least 20 knife wounds. Twelve of the wounds were to his front side and nine were to his back, including a fatal wound which twice penetrated Larry's heart. Text messages made defendant's hostility to Larry abundantly clear, including the fact that he would not miss Larry when he died, he "might end up hurting him," and he "might lose [his] cool one day." Similarly, he told T.S. that he could have taken Larry's life on the night he confronted him when A.A. was there, stating, in fact, that he would have killed her too. Psychological professionals had twice determined they were required to give Larry *Tarasoff* warnings based on defendant's credible, and detailed, threats to kill Larry. Defendant admitted to thinking about killing Larry and using his knife to stab Larry while he was on his way to Larry's house. Defendant did not claim that Larry moved his hand behind his back and that he perceived the need for self-defense until the trial, a matter the jury could have considered in evaluating defendant's credibility. Defendant disposed of the knife and the clothing he

18

wore when he killed Larry, facts that could suggest consciousness of guilt as opposed to any belief in a justified killing in self-defense.

True, there was abundant evidence of Larry's long-term abuse of his family and the effects of that abuse. But we cannot conclude that, in the absence of CALCRIM No. 361, it was reasonably probable the jury would have concluded defendant was not guilty of first degree murder, and instead was guilty of second degree murder, voluntary manslaughter, or guilty of no homicide at all. Thus, we conclude it is not reasonably probable defendant would have achieved a more favorable result had the trial court not instructed the jury with CALCRIM No. 361. (Cf. *People v. Lamer* (2003) 110 Cal.App.4th 1463, 1472 ["we have not found a single case in which an appellate court found the error" in giving CALJIC No. 2.62 to be reversible under *Watson*].)

II

*CALCRIM Nos. 522, 570, 571*

The trial court instructed the jury with CALCRIM No. 522 as follows: "Provocation may reduce a murder based on malice aforethought from first degree to second degree, and may reduce murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. [¶] Also, consider the provocation in deciding whether the defendant committed murder or manslaughter."

The trial court instructed the jury with CALCRIM No. 570, in relevant part: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] . . . [¶] The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as a result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

19

The trial court instructed the jury with CALCRIM No. 571, in pertinent part: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense. [¶] . . . [¶] The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense. [¶] If the People have not met this burden, you must find the defendant not guilty of murder."

Defendant argues: "Although the instructions given provided for the jury the definitions of provocation, heat of passion, and imperfect self-defense, the entire package is wrapped in a ribbon which reads 'reduce' such that the jury first finds a murder has been committed and then asks whether the defendant has sufficiently proved one of these exceptions so as to 'reduce' the murder to manslaughter. This constituted an unconstitutional shifting of the burden of proof from the prosecution to the defendant . . . ." Citing section 1259, defendant claims that his contention is reviewable even absent an objection. Again, we will review the merits of defendant's claim. (See § 1259; *People v. Andersen, supra*, 26 Cal.App.4th at p. 1249.)

"An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law. [Citation.] In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution. [Citations.] The challenged instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*People v. Mitchell, supra*, 7 Cal.5th at p. 579.)

Contrary to defendant's contention, these instructions did not impermissibly shift the burden from the prosecution to the defense. The two instructions on voluntary manslaughter both contained pinpoint instructions specifying that the prosecution bore the burden of proof beyond a reasonable doubt. CALCRIM No. 570 specified: "The

20

People have the burden of proving beyond a reasonable doubt that the defendant did not kill as a result of a sudden quarrel or in the heat of passion.  If the People have not met this burden, you must find the defendant not guilty of murder."  CALCRIM No. 571 contained essentially the same pinpoint instruction applicable to the issue of imperfect self-defense.  These pinpoint instructions left no room for ambiguity as to the prosecution's burden of proof.  Nowhere do these instructions call for a determination that "defendant has sufficiently proved one of these exceptions so as to 'reduce' the murder to manslaughter" as defendant claims.

Furthermore, the trial court instructed the jurors more broadly on the prosecution's burden of proof beyond a reasonable doubt:  "A defendant in a criminal case is presumed to be innocent.  This presumption requires that the People prove a defendant guilty beyond a reasonable doubt.  Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise," and "Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty."  (CALCRIM No. 220.)

We presume the jury followed the trial court's instructions.  (*People v. Letner and Tobin, supra*, 50 Cal.4th at p. 196.)  Reading the instructions as a whole, there is no reasonable likelihood that the jury applied the instructions in the manner claimed by defendant resulting in an impermissible shifting of the burden of proof.

III

*Cumulative Error*

Defendant argues that the cumulative effect of the errors he alleges prejudiced him.  The premise behind the cumulative error doctrine is that, while a number of errors may be harmless taken individually, their cumulative effect may require reversal.  (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1236-1237, disapproved on another ground in *People v. Diaz* (2015) 60 Cal.4th 1176.)  We have found no potential prejudice when

21

considering defendant's first claim of error and no error when considering his second. Thus, there are not multiple errors to consider in the aggregate and we therefore reject defendant's cumulative error claim.  (See *People v. Vieira* (2005) 35 Cal.4th 264, 305; see also *People v. Richie* (1994) 28 Cal.App.4th 1347, 1364, fn. 6.)

IV

*Section 1385*

Section 1385, subdivision (c), as recently amended, provides, in part: "(1) Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute.  [¶]  (2) In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present.  Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety."  (§ 1385, subd. (c)(1)-(2).)

Defendant contends the trial court prejudicially erred in declining to strike the section 12022, subdivision (b)(1) enhancement.  According to defendant, the court failed to recognize that section 1385, as amended, includes a rebuttable presumption in favor of striking the enhancement if statutory mitigating circumstances are present.  The court further did not find that striking the enhancement would endanger public safety so as to rebut that presumption.

Until very recently, there was a split of authority among the Courts of Appeal as to whether the amendment to section 1385, subdivision (c) by Senate Bill No. 81 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 721, § 1) gave rise to a rebuttable presumption in favor of dismissing an enhancement where statutory mitigating circumstances are present unless the trial court finds dismissal would endanger public safety.  Our Supreme Court

22

has now resolved the issue. (*People v. Walker* (2024) 16 Cal.5th 1024, rehg. petn. filed Aug. 30, 2024, time extended to consider modification or rehg. Nov. 13, 2024, S278309.)

In *Walker*, the Supreme Court rejected any notion of a rebuttable presumption in favor of dismissing an enhancement. (*People v. Walker, supra*, 16 Cal.5th at p.1032-1033.) Instead, the Supreme Court concluded that, "absent a finding that dismissal would endanger public safety, a court retains the discretion to impose or dismiss enhancements provided that it assigns significant value to the enumerated mitigating circumstances when they are present." (*Id*. at p.1024.) The Supreme Court discussed with approval the formulation in *People v. Ortiz* (2023) 87 Cal.App.5th 1087, petition for review granted, briefing deferred April 12, 2023, S278894, that, "absent a finding that dismissal would endanger public safety, a court is required to engage 'in a holistic balancing *with special emphasis* on the [nine] enumerated mitigating factors,' in which those mitigating factors weigh 'strongly in favor of . . . dismissal.' " (*Walker, supra*, at p.1029; *id*. at p.1036.) The Supreme Court elaborated: "Stated simply, if the court does not conclude that dismissal would endanger public safety, then mitigating circumstances strongly favor dismissing the enhancement. But ultimately, the court must determine whether dismissal is in furtherance of justice. This means that, absent a danger to public safety, the presence of an enumerated mitigating circumstance will generally result in the dismissal of an enhancement unless the sentencing court finds substantial, credible evidence of countervailing factors that 'may nonetheless neutralize even the great weight of the mitigating circumstance, such that dismissal of the enhancement is not in furtherance of justice.' " (*Id*. at p.1036.)

With that issue resolved, we review the trial court's refusal to dismiss an enhancement under section 1385 for abuse of discretion. (*Nazir v. Superior Court* (2022) 79 Cal.App.5th 478, 490.) Here, the trial court was aware of its discretion to strike the enhancement. (See *People v. Carmony* (2004) 33 Cal.4th 367, 378 ["abuse of discretion occurs where the trial court was not 'aware of its discretion' "].) The court considered

and expressly gave "great weight to the fact that the current offense is connected to prior victimization and childhood trauma." (§ 1385, subd. (c)(2)(E).) In other words, the court "assign[ed] significant value to" that enumerated mitigating circumstance. (*People v. Walker, supra*, 16 Cal.5th at pp.1024-1029, 1037.) The court also found that defendant suffered from mental illness, but further concluded his mental illness did not contribute to the offense. (§ 1385, subd. (c)(2)(D).) Instead, the court found that the murder "was committed because of anger, revenge, and a deliberate decision to eliminate his father from his life and from the lives of his sister and mother. [¶] Given the viciousness of the attack . . . and the number of knife wounds inflicted on the victim's body, including multiple wounds to the back, the Court declines to dismiss the enhancement."

The trial court did not make any finding that "dismissal of the enhancement would endanger public safety." (§ 1385, subd. (c)(2).) However, we conclude that the reasons the trial court articulated for declining to dismiss the enhancement—the viciousness and nature of the deliberate and vengeful attack on defendant's father, including multiple stab wounds to the back, and the motive for the attack—constitute "substantial, credible evidence" derived from defendant's trial, over which the sentencing judge presided, "of countervailing factors that," in the trial court's estimation, " 'neutralize[d] even the great weight of the mitigating circumstance, such that dismissal of the enhancement [was] not in furtherance of justice.' " (*People v. Walker, supra*, 16 Cal 5th at p.1036.)

We conclude that the trial court's determination was not "so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony, supra*, 33 Cal.4th at p. 377.) The court did not abuse its discretion in declining to strike the enhancement.

V

*Abstract of Judgment*

Defendant argues, and the People agree, that the abstract of judgment must be corrected to reflect the sentence actually imposed. The trial court sentenced defendant to 25 years to life for first degree murder and to one additional year for the personal use of a

24

deadly or dangerous weapon enhancement. The abstract of judgment, in box 5, incorrectly states the trial court sentenced defendant to life with the possibility of parole on count one. It also incorrectly states, in box 6d, that the court sentenced defendant to 26 years to life on count one. The abstract correctly indicates in section 2 that the court sentenced defendant to one year on the section 12022, subdivision (b)(1) enhancement. "An abstract of judgment is not the judgment of conviction; it does not control if different from the trial court's oral judgment and may not add to or modify the judgment it purports to digest or summarize." (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) We will order the abstract corrected to reflect the sentence actually imposed by the trial court.

## DISPOSITION

The judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment reflecting the sentence actually imposed—25 years to life on count one and one year on the section 12022, subdivision (b)(1) enhancement—and forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

_____\s\_____,
Krause, Acting P. J.

We concur:

_____\s\_____,
Boulware Eurie, J.

_____\s\_____,
Feinberg, J.

25