Filed 10/23/25  P. v. Geyer CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JARRETT WADE GEYER,<br><br>Defendant and Appellant. | F088153<br><br>(Super. Ct. No. F22909273)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Michael G. Idiart, Judge.

Kristina L. Fox, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Ian Whitney and Hannah Janigian Chavez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Jarrett Wade Geyer was convicted by jury trial of making criminal threats. On appeal, he contends the trial court prejudicially erred (1) when it instructed the jury with CALCRIM No. 361, and (2) by failing to instruct the jury on unanimity. We affirm.

## PROCEDURAL SUMMARY

An information filed by the Fresno County District Attorney charged Geyer with inflicting corporal injury on a spouse/cohabitant (Pen. Code,[1] § 273.5, subd. (a); count 1) and criminal threats (§ 422; count 2). As to count 2, the information alleged the offense involved several aggravating factors. (Cal. Rules of Court, rule 4.421(a), (b).)

On March 21, 2024, a jury found Geyer guilty on count 2. The jury was unable to reach a verdict on count 1, and the trial court declared a mistrial on that count. The court dismissed count 1 and all aggravating factors with respect to count 2 on the prosecution's motion. The court suspended imposition of sentence and granted Geyer three years formal probation with the condition that he serve 270 days in county jail.

On June 6, 2024, Geyer filed a timely notice of appeal.

## FACTUAL SUMMARY

**The Prosecution's Case**

*The Restroom*

On August 16, 2021, Geyer and B.N. were in a dating relationship and had one child together. Geyer discovered pornographic internet history on B.N.'s computer and began arguing with her. He was upset and yelling. B.N., who was sick with food poisoning, needed to use the restroom but Geyer was blocking her. B.N. tried moving past Geyer to use the restroom but she did not make it to the toilet and defecated on the floor.

---

[1] All further statutory references are to the Penal Code.

2.

Geyer followed B.N. into the restroom, yelling at her to clean up the floor. While B.N. was sitting on the toilet, Geyer grabbed a metal water bottle and hit her on the head. After B.N. moved into the shower, Geyer held the shower door open and continued yelling at her to clean up the floor. Geyer grabbed the showerhead and held it over her mouth and nose before she pushed him off. Geyer then grabbed a rag, wiped up feces from the floor, and shoved it in B.N.'s face and mouth. As B.N. got out of the shower, she struggled physically with Geyer and they fell into the restroom mirror, shattering it.

B.N. went back into their bedroom, got dressed, and laid in bed with their child. Geyer was yelling at her for being a bad mother and not helping him clean up the broken glass. Geyer went into their bedroom, punched B.N. on the arms, stomach, and neck, and screamed at her to get out. B.N. went outside to get away from Geyer.

### Backyard

B.N. sat in a chair in the backyard and called her aunt using her cell phone. Using her cell phone, B.N. began recording one of several videos recorded that day. Geyer went outside and argued with B.N. before knocking over her chair. As B.N. was walking back into their home, Geyer grabbed her by her hair and told her, "If you walk out that door, I'll fucking kill you." Geyer went back inside their home and B.N. called law enforcement.

### Investigation and Arrest

Later that day, Fresno County's Sheriff's Deputy Andrew Moreno responded to Geyer and B.N.'s home. When Moreno spoke with B.N., he noticed a "golf ball" size lump on the right side of her forehead. Moreno took several photographs during his investigation, including of the restroom, B.N., and Geyer. One of the photographs was of Geyer's leg, which showed three linear scratches on his calf. Geyer told Moreno that B.N. "stomped" him, leaving those scratches. Moreno did not observe any feces on the ground.

3.

Geyer was arrested the same day. Moreno testified Geyer was arrested in front of his home by another officer and walked over to Moreno's patrol car.

### The Prior Threat

At trial, B.N. testified that, months prior to the incident on August 16, 2021, Geyer had told her if she ever called law enforcement on him, he would kill their son before they could arrive. B.N. believed Geyer would carry out this threat, and it made her fearful to call law enforcement during the incident on August 16, 2021. Regarding the incident on August 16, 2021, B.N. testified she "[had] to be physical" with Geyer in self-defense. She also testified about the cell phone videos she recorded that day, which were shown to the jury.

## The Defense Case

### J.G.'s Testimony

Geyer's father, J.G., lived with Geyer and B.N. J.G. testified he was sitting on the couch when he heard Geyer and B.N. arguing in their bedroom. J.G. heard them yelling at each other, and heard B.N. repeatedly tell Geyer, "I'm going to kill you." J.G. heard Geyer and B.N. eventually took the argument into the backyard. J.G. estimated the argument lasted about 30 to 45 minutes in total.

### Geyer's Testimony

Geyer testified in his own defense. Although Geyer occasionally used a wheelchair, he was not using it during the incident on August 16, 2021. On that day, he confronted B.N. about her recent internet history as well as the messy condition of their home and their child's diaper. Geyer wanted to "gently broach the subject" and "open a dialogue" with B.N. B.N. started yelling at Geyer before trying to use the restroom. B.N. sat on the toilet and continued yelling at Geyer while he began cleaning up the feces. Geyer helped B.N. rinse off in the shower while she yelled at him and swung the showerhead at him. Geyer stuck a rag in her face but did not use the rag to wipe up feces before doing so. As B.N. got out of the shower, she threatened to kill Geyer twice before

4.

punching him on the head and shoving him into the mirror. B.N. fell on the floor, and as she was falling, Geyer hit her on the head with a bottle. After Geyer and B.N. each individually rinsed off in the shower, B.N. laid in bed with their son while Geyer cleaned up the restroom.

About an hour later, B.N. started packing her suitcase and mentioned calling her aunt before grabbing her cell phone and going out to the backyard. B.N. then threatened to take her own life. She held her phone in one hand and a sharp metal object in the other and motioned that she was going to cut her wrist. Geyer "struggle[d]" with B.N. over the sharp metal object but did not realize she was recording on her phone. While in the backyard, B.N. stomped on Geyer while wearing "pink flip flop" shoes which left the scratches on his leg.[2] As the two argued, Geyer told B.N., "[d]on't take this outside." Geyer denied threatening to kill B.N.

Geyer gave a statement to Moreno once he arrived. Geyer told Moreno he argued with B.N. over the pornographic internet history, but did not mention the uncleanliness of their home or their child's diaper. Geyer told Moreno that B.N. threatened to kill him and squeezed his throat. Geyer did not tell Moreno that B.N. defecated on the floor or that she was lightheaded and he had to help her into the shower. Geyer also did not tell Moreno that he stuck a rag in B.N.'s face or that the restroom was slippery.

**The Prosecution's Rebuttal**

The prosecution recalled Moreno to the stand. Moreno testified Geyer's statement was provided shortly after he was detained on the evening of the incident. According to Moreno, Geyer did not mention in his statement that B.N. squeezed his throat or threatened to kill him.

---

[2] On cross-examination, Geyer agreed that the cell phone videos showed B.N. was barefoot.

DISCUSSION

## I.  CALCRIM No. 361

Geyer contends the trial court erred in instructing the jury with CALCRIM No. 361, "Failure to Explain or Deny Adverse Evidence."  He further argues the error requires reversal.  The People disagree with both contentions.  We agree with the People that reversal is not warranted here because, assuming the instruction was erroneously given, the error was harmless.

### A. Additional Background

The prosecution requested the trial court to instruct the jury on the failure to explain or deny adverse evidence (CALCRIM No. 361).  The prosecution noted there were discrepancies between Geyer's testimony and what was captured by the cell phone videos.  The prosecution added:  "He also had significant discrepancies in what he told Deputy Moreno versus what his story was on the stand now today.  So I think the jury should be allowed to consider that."  Geyer objected, arguing the instructions were not relevant because he had explained the discrepancies.

Over Geyer's objection, the trial court read CALCRIM No. 361 to the jury as follows:

> "If [Geyer] failed in his testimony to explain or deny evidence against him, and if he could … reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence.  Any such failure is not enough by itself to prove guilt.  The People must still prove [Geyer] guilty beyond a reasonable doubt.  If [Geyer] failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

### B. Applicable Law

"In determining what inferences to draw from the evidence or facts in the case against a party, the trier of fact may consider, among other things, the party's failure to explain or to deny by his testimony such evidence or facts in the case against him, or his willful suppression of evidence relating thereto, if such be the case."  (Evid. Code, § 413;

see Pen. Code, § 1127 [trial court may comment on a defendant's "failure to explain or to deny by his testimony any evidence or facts in the case against him"].)

CALCRIM No. 361 "applies only when a defendant completely fails to explain or deny incriminating evidence, or claims to lack knowledge and it appears from the evidence that the defendant could reasonably be expected to have that knowledge." (*People v. Cortez* (2016) 63 Cal.4th 101, 117.) "Even if the defendant's testimony conflicts with other evidence or may be characterized as improbable, incredible, unbelievable, or bizarre, it is not, ... 'the functional equivalent of no explanation at all.' " (*Ibid.*) Because "[t]he instruction acknowledges to the jury the 'reasonable inferences that may flow from *silence*,' " the instruction is not appropriate where the defendant's testimony merely contradicts the People's evidence, nor where the defendant's testimony regarding the evidence seems "improbable, incredible, unbelievable, or bizarre." (*Ibid.*) "[A] testifying defendant's failure to explain or deny incriminating evidence—i.e., '[a] defendant's silence'—cannot 'be regarded as a confession' and 'does not create a presumption or warrant an inference of guilt, but should be considered only in relation to evidence that he fails to explain or deny.' " (*Id.* at p. 118; *People v. Vega* (2015) 236 Cal.App.4th 484, 496 ["CALCRIM No. 361 rests on the logical inference that if a person charged with a crime is given the opportunity to explain or deny evidence against him but fails to do so …, then that evidence may be entitled to entitled weight."].)

Recently, our Supreme Court considered the application of CALJIC No. 2.62,[3] the CALJIC "counterpart" to CALCRIM No. 361. (*People v. Barrett* (2025) 17 Cal.5th 897,

---

[3] CALJIC No. 2.62 states:

"In this case defendant has testified to certain matters.

"If you find that [a] [the] defendant failed to explain or deny any evidence against [him] [her] introduced by the prosecution which [he] [she] can reasonably be expected to deny or explain because of facts within [his] [her] knowledge, you may take that failure into consideration as tending to indicate the truth of this evidence and as indicating that

991–992 (*Barrett*).)  There, the defendant testified he could not recall how he cut the murder weapon out of a desk, but also testified that " '[i]t takes a while' " to cut a weapon out of a desk, and that he had " 'done it' " both before and after the offense in question.  (*Id*. at p. 992.)  Our high court first determined the instruction was properly given because the defendant's testimony provided a basis for the instruction.  (*Ibid*.)  The court observed the defendant's lack of knowledge about how he cut the weapon from the desk was a circumstance the defendant could reasonably be expected to know, and thus, the jury was properly instructed it could consider his failure to explain it.  (*Ibid*.)  The court also noted the method by which the knife was cut could bear on elements of the charged offense.  (*Id*. at p. 993.)

The *Barrett* court further concluded any assumed error in giving the instruction was harmless.  (*Barrett*, *supra*, 17 Cal.5th at p. 993; *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) [finding error harmless unless it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error].)  The court first determined the language of CALJIC No. 2.62 mitigated any harmful impact since it explained the instruction only applies " '[i]f you find that the defendant failed to explain or deny any evidence against him introduced by the prosecution which he can reasonably be expected to deny or explain because of facts within his knowledge' " and any such finding " 'does not, by itself, warrant an inference of guilt, nor does it relieve the prosecution of its burden of proving every essential element of the

---

among the inferences that may reasonably be drawn therefrom those unfavorable to the defendant are the more probable.

"The failure of a defendant to deny or explain evidence against [him] [her] does not, by itself, warrant an inference of guilt, nor does it relieve the prosecution of its burden of proving every essential element of the crime and the guilt of the defendant beyond a reasonable doubt.

"If a defendant does not have the knowledge that [he] [she] would need to deny or to explain evidence against [him,] [her,] it would be unreasonable to draw an inference unfavorable to [him] [her] because of [his] [her] failure to deny or explain this evidence."

crime and the guilt of the defendant beyond a reasonable doubt.' " (*Barrett*, *supra*, 17 Cal.5th at p. 993.) The court observed the jury was "otherwise instructed on witness believability (CALJIC No. 2.20) that it could consider '[t]he extent of the opportunity or ability of the witness to see or hear or otherwise become aware of any matter about which the witness testified; The ability of the witness to remember or to communicate any matter about which the witness has testified.' " (*Ibid*.) The jury in *Barrett* was also instructed on "discrepancies in testimony (CALJIC No. 2.21.1)" that " '[d]iscrepancies in a witness's testimony … do not necessarily mean that a witness should be discredited. Failure of recollection is common. Innocent mis recollection [*sic*] is not uncommon. ... You should consider whether a discrepancy relates to an important matter or only to something trivial.' " (*Ibid*.) The *Barrett* court determined the defendant "either explained or denied the critical portions of the prosecution's case, including how and why he killed [the victim]." (*Ibid*.) Therefore, considering the instructions and the record, our high court concluded it was not reasonably probable that any negative inference drawn from the defendant's failure to explain "less critical" evidence affected the outcome of his case. (*Ibid*.)

### C. Analysis

Geyer first argues it was error for the trial court to instruct the jury with CALCRIM No. 361, because he explained or denied all he was accused of, or was confronted with, in his testimony. He further argues the error was prejudicial because it highlighted his testimony over that of the other witnesses in the trial and improperly suggested he failed to explain or deny evidence. In making the latter argument, he characterizes the record as " 'closely balanced' " since the jury was unable to reach a verdict on count 1.

The People contend the instructions were properly given. Furthermore, even assuming error, the People argue it was harmless because the language of the instruction,

as well as the other instructions given, mitigated against any prejudice from receiving the instruction on this record.

We need not determine whether the instruction was erroneously given because we conclude any assumed error was harmless. (See *Barrett*, *supra*, 17 Cal.5th at p. 993 [applying *Watson* standard of harmless error to substantially similar CALJIC No. 2.62 instruction].) First, we agree with the People the language of CALCRIM No. 361 mitigated any prejudicial impact of receiving the instructions. Any harmful impact of CALCRIM No. 361 was mitigated by its language explaining to jurors that the instruction only applies "[i]f the defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew," and further, any such finding "is not enough by itself to prove guilt." (CALCRIM No. 361; see *Barrett*, *supra*, 17 Cal.5th at p. 993 [any harmful impact of CALCJIC No. 2.62 was mitigated by its inclusion of similar language].) Additionally, just as in CALJIC No. 2.62, the instructions here explicitly stated the prosecution must still prove the defendant guilty beyond a reasonable doubt. (CALCRIM No. 361; *Barrett*, *supra*, 17 Cal.5th at p. 993.)

Further, any prejudicial impact from the instruction was mitigated by other instructions by the trial court. (See *Barrett*, *supra*, 17 Cal.5th at p. 993 [noting other instructions given in determining the error was harmless]; *People v. Saddler* (1979) 24 Cal.3d 671, 684 [other instructions given in a case "may be considered in assessing the prejudicial effect of an improper instruction"].) The court also instructed the jury that not all the instructions were necessarily applicable (CALCRIM No. 200): "Some of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." (See *People v. Vega*, *supra*, 236 Cal.App.4th at p. 503 [any prejudicial effect from CALCRIM No. 361 was mitigated by the trial court's

CALCRIM No. 200 instruction].)  We presume the jury disregarded CALCRIM No. 361 if it determined the instruction did not apply.  (See *People v. Sanchez* (2001) 26 Cal.4th 834, 852 ["Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions."].)

In arguing there is a reasonable probability of a different outcome absent the instruction, Geyer suggests the jury's inability to reach a verdict on count 1 shows the jury "clearly doubted" B.N.'s credibility.  We are not persuaded.  The jury was instructed with CALCRIM No. 226, which states in part:  "You may believe all, part, or none of any witness's testimony.  Consider the testimony of each witness and decide how much of it you believe."  The jury was thus permitted to believe some but not all of B.N.'s testimony.  The jury was also instructed that it "must consider each count separately and return a separate verdict for each one."  (CALCRIM No. 3515; see *People v. Sanchez*, *supra*, 26 Cal.4th at p. 852.)  The jury's inability to reach a verdict on count 1 thus does not demonstrate prejudice regarding count 2.

Moreover, the evidence against Geyer on count 2 was strong.  B.N. recorded the threat, which was played for the jury.  B.N. also testified as to what Geyer stated.  While the record suggests the cell phone video did not clearly capture the threat, it was for the trier of fact to determine what was said in the video and whether that constituted a criminal threat.  We are not convinced CALCRIM No. 361 might have influenced these determinations against Geyer.[4]

---

[4] Geyer further argues we must view this error in relation to his other claims of error.  But as discussed below, we find no error in the trial court's handling of the unanimity instructions.  To the extent Geyer raises an additional claim of cumulative error, this claim is forfeited.  (Cal. Rules of Court, rule 8.204(a)(1)(B) [each brief must "[s]tate each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority"]; *People v. Stanley* (1995) 10 Cal.4th 764, 793 [" '[E]very brief should contain a legal argument with citation of authorities on the points made.  If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration.' "].)  In any event, the claim fails.  (See *People v. Bradford* (1997) 14 Cal.4th 1005, 1057 [rejecting cumulative

There is no reasonable probability that Geyer would have obtained a more favorable outcome absent this instruction.

## II. Unanimity Instruction

Geyer contends the trial court prejudicially erred by failing to give a unanimity instruction (CALCRIM No. 3500) on count 2, criminal threats, because there were multiple threats that suggested more than one discrete criminal threat crime. We conclude no such instruction was required.

### A. Additional Background

The jury heard evidence of multiple threats made by Geyer. As discussed above, B.N. testified Geyer told her during the incident he would kill her if she walked out the front door. Additionally, from the same day, one of the cell phone videos shown to the jury captured the following interaction between Geyer and B.N.:

> "[Geyer]: … Then fucking call the cops and fucking let's see what happens.
>
> "[B.N.]: Get away from me.
>
> "[Geyer]: Call them and let's see if it's self-defense when we're done!
>
> "[B.N.]: Leave me alone!
>
> "[Geyer]: Your fat fucking ass wants to go to jail, fucking call them then!"

B.N. felt scared for herself and their son but was not sure whether the threat was directed towards her, their son, or whether Geyer was referring to B.N. being arrested. Finally, B.N. testified Geyer, about a month prior to the August incident, stated he would kill their son if she ever called law enforcement on him.

---

prejudice claim because each claim of error lacked merit or did not result in prejudice]; see also *People v. Winbush* (2017) 2 Cal.5th 402, 487 ["There are no additional errors, assumed or otherwise, to accumulate."].)

12.

The prosecution requested the trial court give the instruction on unanimity (CALCRIM No. 3501). At a hearing, the court denied giving the requested instruction, noting the instruction did not apply and Geyer did not ask for it. Geyer did not object when the court declined to give the instruction.

During closing arguments, when moving to count 2, the prosecution explained to the jury:

> "There's quite a lot of elements. But it really boils down to common sense. [Geyer ] willfully threatened to unlawfully kill [B.N.]. I'm just going to say 'unlawfully kill' because that's where we're going with this. The threat was made orally, he intended his statement to be understood as a threat and intended that it be communicated to [B.N.]. [¶] … [¶] So this is quite a lot in here, and we'll break it down. But the threat was clear. 'If you go out this front door, I'm going to kill you.' "

The prosecution referenced the two other threats at various points during its closing argument. For example, the prosecution stated:

> "[B.N.]'s testimony. How did it make her feel? She was afraid for herself. She was afraid for her son who is in the house. And why was she afraid for her son? Because a couple months prior, [Geyer ] said, 'If you call the cops I'll kill our son.' She felt trapped in that relationship. They'd been having issues. They'd been having intimacy issues. She did not feel like she could get out.

> "[Geyer's] statement. This is in another one of the videos, in the whole course of this argument, 'Fucking call the cops and fucking let's see what happens, Bitch. Fucking call them.' I don't know how much more that could be understood as a threat and intended as a threat.

> "That prior threat that I mentioned played into [B.N.]'s fear as well, that if she did something [Geyer] didn't want her to do, something bad was going to happen to her, the worst could happen to her."

Regarding count 2, defense counsel in closing argument explained:

> "So let's talk about Count 2. [Geyer] did not make a criminal threat. [Geyer] made a threat. [Geyer] made a statement. But that statement was not criminal. We need to see the difference. There is a difference. [Geyer] uses [vile] language, but there is a difference."

13.

Defense counsel added:

> "So, again, do you know what I'm getting at right now, before I get to the words of the language? I'm talking about the circumstances and what the scene was like around the threat, to see if we can determine whether that threat was a crime and it meets the elements of [section] 422 or criminal threats."

Regarding the language of "the threat," defense counsel stated:

> "Now let's talk about the language. This is what I think [Geyer] said. You're the judge. The transcripts are not evidence. You be the judge. People's Exhibit 12. 'You bring this out front, I will fucking' – unintelligible – 'out of you.' I don't know what that means. That's the language. And, yes, in a court of law, that language matters, exactly what he said.

> "This phrase is not clear. It's not unconditional. It's not specific. Now, I want to be fair, right? The phrase does not have to be entirely unconditional. I'm not over here nit-picking over an emergency situation, but come on, in front of a jury? The government is trying to obtain a conviction on this? In the heat of a battle in an argument? This is why we're here. This is why we need [a] jury trial."

## B. Applicable Law

To convict a defendant of a crime, the jury's verdict must be unanimous. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) "[W]hen the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." (*Ibid*.) "The prosecution can make an election by 'tying each specific count to specific criminal acts elicited from the victims' testimony'—typically in opening statement and/or closing argument." (*People v. Brown* (2017) 11 Cal.App.5th 332, 341.) A unanimity instruction is not required when the prosecution makes such an election. (*Ibid*.)

We review a claim of instructional error de novo. (*People v. Waidla* (2000) 22 Cal.4th 690, 733.) "Whether or not to give any particular instruction in any particular

case entails the resolution of a mixed question of law and fact that … is … predominantly legal. As such, it should be examined without deference." (*Ibid.*)

**C. Analysis**

Geyer contends the trial court had a duty to instruct the jury because there was evidence of multiple threats. In his reply, Geyer notes the three threats placed before the jury were: (1) Geyer would kill B.N. if she went out the front door, (2) B.N. would " 'see what happens' " if she called law enforcement, and (3) Geyer would kill their child if B.N. called law enforcement. Geyer argues the evidence of multiple threats created the risk that the jury divided as to which act constituted the charged conduct.

We conclude no unanimity instruction was required because the prosecution made a clear election during closing argument regarding the specific threat on which count 2 was based. The prosecution made clear to the jury that count 2 was based on one threat—the threat to kill B.N. if she went out the front door. Addressing count 2, the prosecution stated: "The threat was made orally, he intended his statement to be understood as a threat and intended that it be communicated to [B.N.]. [¶]…[¶] So this is quite a lot in here, and we'll break it down. But the threat was clear. 'If you go out this front door, I'm going to fucking kill you.' " The prosecution then tied the elements of the offense (§ 422) to that threat. The record shows the prosecution, after originally requesting the instruction, made an election which obviated the need for a unanimity instruction. (*People v. Brugman* (2021) 62 Cal.App.5th 608, 629 ["This type of direct and clear statement qualifies as an effective election."]; *People v. Brown*, *supra*, 11 Cal.App.5th at p. 341.)

Geyer notes the instances in which the prosecution referenced the three threats during closing argument. However, on this record, the presence of the two other threats did not create the risk that the jury divided as to which threat constituted the charged offense. Comparatively, we observe the prosecution referenced the front door threat first and foremost. Then, after tying the elements of the offense to that threat, the prosecution

15.

began referencing the two other threats in the context of the fear experienced by B.N. These references do not alter our conclusion that the prosecution elected the front door threat as the basis for count 2. Put simply, this was not a case in which the prosecution asked the jurors to select from among the three threats in order to convict Geyer of count 2.

Geyer's contention is further weakened by his defense counsel's closing argument, which reflected the prosecution's election. Introducing count 2, defense counsel stated: "So let's talk about Count 2. [Geyer] did not make a criminal threat. [Geyer] made a threat. [Geyer] made a statement. But that statement was not criminal." Defense counsel's closing argument then focused on the front door threat. Regarding this threat specifically, defense counsel asked the jury: "The government is trying to obtain a conviction on this?" Both the prosecution and defense counsel thus told the jury count 2 was based on one threat–the front door threat.

Geyer's reliance on *People v. Hernandez* (2013) 217 Cal.App.4th 559 is misplaced. There, the defendant was convicted of unlawful possession of a firearm and ammunition. (*Id.* at p. 562.) The Court of Appeal observed the prosecutor's closing arguments referred to two separate instances in which he possessed the firearm, but the prosecutor never elected which of the two incidents was the basis for the charges. (*Id.* at p. 567.) The *Hernandez* court thus reasoned the jurors could have reasonably divided on which instance of possession they used to convict the defendant of the charged offenses. (*Id.* at p. 571.) Here, by contrast, the prosecution clearly elected the threat which served as the basis for count 2–"If you go out this front door, I'm going to fucking kill you." Geyer's closing arguments also reflected this election. The instant record is thus clearly distinguishable from that of *Hernandez*.

Accordingly, we conclude a unanimity instruction was not required, and no instructional error occurred.[5]

## **DISPOSITION**

The judgment is affirmed.

ELLISON, J.[*]

WE CONCUR:

PEÑA, Acting P. J.

SNAUFFER, J.

---

[5] Because we conclude the trial court did not commit instructional error, we need not address Geyer's related claim that the error was prejudicial.

[*] Retired judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.